Filed 2/1/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S237374 |
| v. | ) | |
| | ) | Ct.App. 1/1 A144196 |
| JODY CHATMAN, | ) | |
| | ) | Alameda County |
| Defendant and Appellant. | ) | Super. Ct. No. 140542 |
| _____ | ) | |

Anyone convicted of a felony in California suffers consequences. Even long after a defendant completes a term of incarceration or probation, some of these consequences — such as ineligibility for certain employment licenses — persist. To ease this ongoing burden, individuals can seek a certificate of rehabilitation. But not all convicted felons are eligible on an equal basis for such certificates. While former probationers and former prisoners are both eligible, former probationers face different eligibility criteria after they have been granted relief under Penal Code section 1203.4,[1] which allows former probationers to move for their conviction to be dismissed upon successful completion of probation terms. Once former probationers receive the benefit of having their convictions dismissed under section 1203.4, another provision — section 4852.01 — renders them ineligible for a certificate of rehabilitation if they are subsequently incarcerated. (See § 4852.01, subd. (b).) In contrast, former prisoners — whether

---

[1] All unlabeled statutory references are to the Penal Code.

subsequently incarcerated or not — face no such restriction. (See *id.*, subd. (a).) The question in this case is whether these eligibility criteria survive an equal protection challenge under the federal and state constitutions, which in turn depends on whether the criteria survive rational basis review. The Court of Appeal held that section 4852.01's separate requirements governing former probationers whose convictions were dismissed under section 1203.4 are categorically irrational, and therefore deny petitioners equal protection of law. Bearing in mind that the scheme at issue is subject to neither heightened nor intermediate scrutiny, we conclude otherwise: section 4852.01's eligibility criteria survive rational basis review.

The Legislature's decision to provide former probationers access to certificates of rehabilitation serves the laudable goal of decreasing the unfortunate aftereffects of felony convictions on those who achieve rehabilitation. But while certificates provide substantial benefits to rehabilitated felons, adjudicating eligibility for them depends on the state's expenditure of significant judicial and executive branch resources. In providing this costly benefit only to former prisoners and former probationers who have not been subsequently incarcerated, the Legislature engaged in a line-drawing that — while perhaps not emblematic of the ideal rehabilitative system — embodies a sufficiently rational determination regarding distribution of resources.

Distinctions between former probationers and former prisoners underscore why. Former probationers, as opposed to former prisoners, can seek some relief from the effects of their convictions through section 1203.4, and so exhibit somewhat less relative need for certificate of rehabilitation relief. Moreover, when the Legislature first provided access to certificates of rehabilitation in 1943, it did so only for former prisoners. Only in 1976 was the benefit extended to former probationers not subsequently incarcerated. From the legislative history, it

2

appears that lawmakers at the time weighed the increased cost of extending relief. And instead of choosing an arbitrary means of limiting such access, legislators used subsequent incarceration as a means of determining which former probationers show the most promise for rehabilitation. If these justifications for the statute's treatment of former probationers do not necessarily reflect the ideal distribution of certificates of rehabilitation, neither can we conclude they are wholly irrational. What the framework enacted by the Legislature permits is for certain people to mitigate the effects of felony convictions in a world of limited resources. The basis for allocating those resources is sufficiently grounded in non-illusory distinctions between subsequently incarcerated former probationers and other classes of convicted felons to survive rational basis scrutiny under the equal protection clauses of the state and federal constitutions.

I.

Jody Chatman was convicted of robbery in 2001. The trial judge sentenced him to a five-year term of felony probation with a 180-day term in jail. Two years later, Chatman was convicted of misdemeanor reckless driving with alcohol involved in violation of Vehicle Code section 23103, also called a "wet reckless." In 2006, the reckless driving conviction was dismissed under section 1203.4. In 2007, the robbery conviction was also dismissed under section 1203.4. Then, in 2008, Chatman was convicted of misdemeanor driving under the influence in violation of Vehicle Code section 23152, subdivision (b). He was sentenced to a three-year term of probation along with a 10-day term of imprisonment in county jail. In 2014, Chatman was offered a job that required a community care license from the Department of Social Services. Although Chatman's robbery conviction generally bars him from obtaining a community care license, the Department of Social Services "may grant an exemption" to this bar "if the employee or prospective employee has received a certificate of rehabilitation pursuant to . . .

3

Section 4852.01." (Health & Saf. Code, § 1522, subd. (g)(1)(A)(ii).)[2] Chatman filed a petition for a certificate of rehabilitation under section 4852.01 in October 2014. His petition acknowledged that he was "technically barred from a certificate of rehabilitation" but claimed that section 4852.01's unequal treatment of former probationers whose convictions had been dismissed under section 1203.4 was unconstitutional. The trial court denied the petition.

The Court of Appeal reversed that ruling. The court acknowledged that *People v. Jones* (1985) 176 Cal.App.3d 120 "was decided more than 30 years ago and addressed the identical question presented here." (*People v. Chatman* (2016) 2 Cal.App.5th 561, 571.) But it disagreed with *Jones*, which had upheld section 4852.01's eligibility criteria. (*Ibid.*) The Court of Appeal in Chatman's case then went on to observe that the "Attorney General in this appeal . . . fails to offer a rationale for the differential treatment, except to repeat the observations contained in *Jones*." (*Ibid.*) The court held that "the statutory scheme governing eligibility for certificates of rehabilitation denies Chatman his rights to equal protection." (*Id.* at p. 572.) It then remanded to the trial court "with directions to consider the

---

**2**      Even if Chatman had satisfied the criteria for this exemption, he would have faced a second statutory hurdle. The Department of Social Services is barred from granting a community care license to applicants who were convicted of certain crimes, including robbery. (See Health & Saf. Code, § 1522, subd. (g)(1)(A)(i).) But "the department may grant an exemption" (*id.*, subd. (g)(1)(A)(ii)) to that bar for "[a]ny felony in which the defendant inflicts great bodily injury on any person" or "uses a firearm" (Pen. Code, § 667.5, subd. (c)(8)). Felons who committed robbery using a firearm or involving great bodily harm to a victim thus have a pathway to obtaining a community care license, while felons who committed other forms of robbery do not. This unequal treatment of different types of robbery was held unconstitutional in *Doe v. Saenz* (2006) 140 Cal.App.4th 960, 989-993. Chatman's robbery conviction did not involve use of a firearm or great bodily harm to a victim. But the constitutionality of Health and Safety Code section 1522 is not before us in this case, so we do not address it.

4

merits of Chatman's petition for a certificate of rehabilitation." (*Id.* at p. 573.) We granted the Attorney General's petition for review.

## II.

Chatman claims it is unconstitutional for the Legislature to impose a disparate process for obtaining a certificate of rehabilitation through section 4852.01 on former probationers whose convictions were dismissed under section 1203.4. In the history and procedures associated with these certificates — along with the rules governing access to relief under section 1203.4 — we find the context for our analysis.

When the original certificate scheme was enacted, it was "an urgency measure" forged against the backdrop of World War II. (*People v. Ansell* (2001) 25 Cal.4th 868, 874.) As demand for labor and military recruitment heightened, the Governor's office was deluged with pardon applications from ex-felons barred from serving in the military or working in defense-related industries. (*Id.* at pp. 874-875.) The certificate of rehabilitation relieved pressure by creating a means for felons to apply for a pardon through which the merits of a particular application could be adjudicated, so that " 'the Governor [could], without any further investigation, issue a pardon to the person named therein.' " (*Id.* at p. 876; see also § 4852.16 [a certificate of rehabilitation "constitute[s] an application for a full pardon"].) Although an eventual pardon returns most of a convicted felon's rights (see *Ansell*, at p. 877, fn. 16), the certificate itself also provides relief from certain effects of a felony conviction, such as ineligibility from certain employment licenses (*id.* at p. 877 & fn. 17; Health & Saf. Code, § 1522, subd. (g)(1)(A)(ii) [stating that the Department of Social Services "may grant an exemption" to the bar on community care licenses "if the employee or prospective employee has received a certificate of rehabilitation"]; Bus. & Prof. Code, § 480, subd. (b) ["Notwithstanding any other provision of this [Business and Professions]

5

code, a person shall not be denied a license solely on the basis that he or she has been convicted of a felony if he or she has obtained a certificate of rehabilitation."]).

To obtain a certificate of rehabilitation and benefit from the relief it provides, petitioners must satisfy a number of conditions. An eligible felon may only file a petition for a certificate of rehabilitation after a specified "period of rehabilitation," which must last a minimum of five years from the petitioner's release from prison or placement on probation. (§ 4852.03, subds. (a), (b); § 4852.06.) During the period of rehabilitation, the petitioner must "live an honest and upright life, shall conduct himself or herself with sobriety and industry, shall exhibit a good moral character, and shall conform to and obey the laws of the land." (§ 4852.05.) A potential petitioner is "entitled to receive counsel and assistance from all rehabilitative agencies, including the adult probation officer of the county and all state parole officers." (§ 4852.04.) In the proceedings before the trial court, the petitioner is entitled to the assistance of appointed counsel. (§ 4852.08.) The trial court "may require testimony as it deems necessary," and may require, "without expense of any kind to the petitioner," "the production . . . of all records and reports relating to the petitioner and the crime of which he or she was convicted." (§ 4852.1, subd. (a).) The trial court may also order the district attorney to investigate the petitioner's residence, criminal history, representations to the trial court, and conduct during the period of rehabilitation, as well as "any other information the court deems necessary in making its determination." (§ 4852.12, subd. (a).)

The trial court has discretion whether to grant a petition for a certificate of rehabilitation. (See *People v. Lockwood* (1998) 66 Cal.App.4th 222, 228 ["Section 4852.13 . . . gives courts the express discretion to decide whether a petitioner has demonstrated [rehabilitation] to [the trial court's]

6

satisfaction . . . ."].)  In exercising its discretion, the trial court considers whether the petitioner has demonstrated "by his or her course of conduct his or her rehabilitation and his or her fitness to exercise all of the civil and political rights of citizenship."  (§ 4852.13, subd. (a).)  If the trial court grants the petition, the clerk of the court must immediately forward the certificate of rehabilitation to the governor's office so that the petitioner can be considered for a pardon. (§ 4852.14; § 4852.16.)  But if the petitioner violates the law during the period of rehabilitation, "the court may deny the petition and determine a new period of rehabilitation not to exceed the original period of rehabilitation for the same crime."  (§ 4852.11.)

Moreover, in order to even begin the process of applying for a certificate of rehabilitation, the petitioner must be eligible by satisfying the criteria set forth in section 4852.01.  Felons "committed to a state prison or other institution or agency" are eligible to apply even if they have been incarcerated after serving their initial sentence.  (§ 4852.01, subd. (a).)  But felons for whom "the accusatory pleading" of the underlying felony conviction "has been dismissed pursuant to Section 1203.4" are eligible only if they (1) have "not been incarcerated in a prison, jail, detention facility, or other penal institution or agency since the dismissal of the accusatory pleading"; (2) "[are] not on probation for the commission of any other felony"; and (3) "present[] satisfactory evidence of five years' residence in this state prior to the filing of the petition."  (*Id.*, subd. (b).)

The aforementioned section 1203.4 requires, meanwhile, for the underlying conviction to be dismissed "[i]n any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation."  (§ 1203.4, subd. (a)(1).)  The trial court may also dismiss a conviction under section 1203.4 where a probationer has not satisfied the terms of probation if it is in "the interests of justice."  (*Ibid.*)

7

Although section 1203.4 provides that a dismissal releases the defendant "from all penalties and disabilities resulting from the offense," dismissal does not ease all the burdens of a felony conviction. (*Ibid.*) To the contrary: the felon remains "obligat[ed] to disclose the conviction in response to any direct question contained in any questionnaire or application for public office [or] for licensure by any state or local agency." (*Ibid.*) Section 1203.4 dismissal also does not restore the ability to hold public offices that the felony barred (see *id.*, subd. (a)(3)) or "to own, possess, or have in his or her custody or control any firearm" (*id.*, subd. (a)(2)). Licensing boards remain free to suspend or revoke professional licenses "irrespective of a subsequent order under the provisions of Section 1203.4." (Bus. & Prof. Code, § 490, subd. (c); see also *id.*, § 6102, subd. (c) [providing for summary disbarment of attorneys "irrespective of any subsequent order under Section 1203.4"]; *id.*, § 2236.1, subd. (d) [same for suspension of medical licenses]; Ed. Code, §§ 44008, subd. (a), 44009, subds. (a) & (c) [same for certain provisions concerning educational employment].) Section 1203.4 dismissal also does not affect sex offender registration (see § 290.007) or "any revocation or suspension of the privilege of the person convicted to drive a motor vehicle" (Veh. Code, § 13555).

Nonetheless, dismissal under section 1203.4 provides at least some relief. Among other benefits, Labor Code section 432.7 prohibits an "employer, whether a public agency or private individual or corporation" from "ask[ing] an applicant for employment to disclose . . . information . . . concerning a conviction that has been judicially dismissed or ordered sealed pursuant to law, including . . . Section[] 1203.4." (Lab. Code, § 432.7, subd. (a)(1).) Moreover, Business and Professions Code section 480, subdivision (c) provides that "[n]otwithstanding any other provisions of this [Business and Professions] code, a person shall not be

8

denied a license solely on the basis of a conviction that has been dismissed pursuant to Section 1203.4." (Bus. & Prof. Code, § 480, subd. (c).)

III.

Chatman is a subsequently incarcerated former probationer. Because of this status, Chatman claims he is part of a group that is unconstitutionally subject to unequal treatment because felons are ineligible for a certificate of rehabilitation if they are incarcerated after a section 1203.4 dismissal. Both the state and federal constitutions extend to persons the equal protection of law. (See U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a); see also *In re Gary W.* (1971) 5 Cal.3d 296, 303 [" 'The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' [Citation.]"].) Though this court's analysis of state constitutional requirements sometimes deviates from how comparable federal requirements are analyzed, our precedent has not distinguished the state and federal guarantees of equal protection for claims arising from allegedly unequal consequences associated with different types of criminal offenses. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*); *People v. Hofsheier* (2006) 37 Cal.4th 1185, 1199-1201.)

Our most recent case addressing claims of this kind is *Johnson*. The case upheld as rational a statute establishing discretionary sex offender registration for persons convicted of unlawful sexual intercourse with a minor, but making it mandatory for individuals convicted of offenses involving other types of sexual activity with a minor. (*Johnson*, *supra*, 60 Cal.4th at p. 874.) What we reiterated is that we had "authority to construe our state Constitution independently" but saw no reason to bifurcate state and federal analysis in that context. (*Id.* at p. 881; see also *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 571-572.) Relying on *Johnson*, the Court of Appeal in Chatman's case also saw "no reason to suppose"

9

that federal equal protection analysis would yield a result different from what would emerge from analysis of the state Constitution.  (See *People v. Chatman*, *supra*, 2 Cal.App.5th at p. 568, fn. 3.)  We see no reason to suppose so either.

At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.  (*People v. McKee* (2010) 47 Cal.4th 1172, 1207) ["[E]qual protection safeguards against the arbitrary denial of benefits to a certain defined class of individuals."].)  The extent of justification required to survive equal protection scrutiny in a specific context depends on the nature or effect of the classification at issue.  Unequal treatment based on a suspect classification such as race is subject to " 'the most exacting scrutiny.' "  (*People v. Wilkinson* (2012) 33 Cal.4th 821, 836.)  So is treatment affecting a fundamental right.  (See *Warden v. State Bar* (1999) 21 Cal.4th 628, 641 [" '[I]n cases involving "suspect classifications" or touching on "fundamental interests" . . . courts adopt "an attitude of active and critical analysis, subjecting the classifications to strict scrutiny.  [Citations.]  Under the strict standard applied in such cases, *the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose."  [Citation.]' "].)  In the high court, certain other classifications, such as gender and illegitimacy, trigger "intermediate scrutiny" under the federal constitution.  (*Hernandez v. City of Hanford* (2007) 41 Cal.4th 279, 299, fn. 12 ["In applying the federal equal protection clause, the United States Supreme Court has applied a third standard — 'intermediate scrutiny' — 'to discriminatory classifications based on sex or illegitimacy.' "].  But see *Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 564 ["We long ago concluded that discrimination based on gender violates the equal protection clause of the California Constitution (art. I, § 7, subd. (a)) and triggers the highest level of scrutiny."].)

10

Yet where the law challenged neither draws a suspect classification nor burdens fundamental rights, the question we ask is different. We find a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose. (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) This core feature of equal protection sets a high bar before a law is deemed to lack even the minimal rationality necessary for it to survive constitutional scrutiny. Coupled with a rebuttable presumption that legislation is constitutional, this high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's trade-offs seem unwise or unfair. (See *Heller v. Doe* (1993) 509 U.S. 312, 319 ["[R]ational-basis review . . . 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.' [Citations.] Nor does it authorize 'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.' "]; see also *Johnson*, *supra*, 60 Cal.4th at p. 880, fn. 5.)

In order to decide whether a statutory distinction is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection, we typically ask two questions. We first ask whether the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner. (*People v. McKee*, *supra*, 47 Cal.4th at p. 1202.) If we deem the groups at issue similarly situated in all material respects, we consider whether the challenged classification ultimately bears a rational relationship to a legitimate state purpose. (*Johnson*, *supra*, 60 Cal.4th at p. 881.) A classification in a statute is presumed rational until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable. (See *ibid.*; see also *Gerawan Farming, Inc. v. Agricultural Labor Relations Board* (2017) 3 Cal.5th 1118, 1140] [holding that " ' "a statutory classification that neither proceeds along suspect lines nor infringes

11

fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." ' [Citation.]"].)  The underlying rationale for a statutory classification need not have been "ever actually articulated" by lawmakers, and it does not need to "be empirically substantiated."  (*Johnson*, at p. 881.)  Nor does the logic behind a potential justification need to be persuasive or sensible — rather than simply rational.  (See *ibid.*)

IV.

Chatman contends that he and other former probationers incarcerated after their convictions were dismissed share a characteristic pivotal to the outcome of this case — they are, in all material respects, similarly situated to formerly incarcerated former prisoners, who remain eligible to apply for a certificate of rehabilitation even if subsequently incarcerated.  We assume without deciding that Chatman is correct regarding the similarly situated nature of these two groups, so we may consider the more fundamental question of whether section 4852.01's unequal treatment of the groups bears a rational relationship to a legitimate state purpose.  What the Attorney General maintains is that the answer to this question is straightforward:  the current statutory scheme is rational, among other reasons, because it "conserves judicial resources by reserving certificate of [rehabilitation] proceedings to only those former felons who are likely to be able to demonstrate rehabilitation."

The Legislature's decision to provide certificates of rehabilitation to former probationers and former prisoners serves the laudable goal of decreasing the negative effects of felony convictions for those convicted felons who have achieved rehabilitation.  However laudable the goal, processing certificates of rehabilitation — once conceived as a means of relieving a burden on gubernatorial clemency decisions — nonetheless requires the expenditure of significant

12

resources. The Penal Code provides eligible petitioners access to rehabilitative services and counsel during the five-year period of rehabilitation and appointed counsel for the certificate of rehabilitation proceedings. (§ 4852.03, subd. (a); § 4852.04; § 4852.08.) The trial court must determine whether the petitioner has "demonstrated by his or her course of conduct his or her rehabilitation and his or her fitness to exercise all of the civil and political rights of citizenship." (§ 4852.13, subd. (a).) To assist in this determination, the court may order testimony and the production of evidence at the government's expense and may require the district attorney to perform an investigation. (§ 4852.1, subd. (a); § 4852.12, subd. (a).) And once a certificate of rehabilitation has been granted, the certificate is immediately forwarded to the governor's office, which then evaluates the petitioner for a pardon. (§ 4852.14; § 4852.16.) Irrespective of the outcome relative to any individual petitioner, this sequence involves the expenditure of significant judicial and executive branch resources.

Preserving the government's financial integrity and resources is a legitimate state interest. (See *Ortwein v. Schwab* (1973) 410 U.S. 656, 660 [holding appellate filing fee of $25 was rationally related to offsetting court system's costs]; *American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 374 [holding that "administrative costs" rationale defeats equal protection claim against statute authorizing periodic payment procedure for medical malpractice victims].) Moreover, equal protection does not require a perfect fit between a statute's means and the legitimate state ends those means can serve. (*Johnson*, *supra*, 60 Cal.4th at p. 887 [" 'A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends" ' [citation], or 'because it may be "to some extent both underinclusive and overinclusive" ' [Citation]."].) What we require is for the relationship between means and ends to be rational. (See *id.* at p. 898 ["[W]hile the Legislature may

13

rationally address a problem ' "in less than comprehensive fashion by 'striking the evil where it is felt most' [citation], its decision as to where to 'strike' must have a rational basis in light of the legislative objectives" ' "].)

On the other hand, an entirely arbitrary decision to withhold a benefit from one subset of people, devoid of any conceivable degree of coherent justification, might not pass rational basis review merely because it decreases the expenditure of resources. (Cf. *Plyler v. Doe* (1982) 457 U.S. 202, 227 [holding, albeit in an intermediate scrutiny context, that "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources"].) The question then is whether the classification at issue in this case, which bars subsequently incarcerated former probationers from certificate of rehabilitation relief, is a rational means of preserving government resources.

We answer yes. The Legislature has chosen to extend certificate of rehabilitation relief to only a subset of former probationers based on rational distinctions between subsequently incarcerated former probationers and other convicted felons. First of all, former prisoners have a higher relative need for certificate of rehabilitation relief than former probationers. Former probationers who have successfully completed their terms of probation have a right to dismissal of their conviction under section 1203.4. (§ 1203.4(a)(1).) Such a dismissal does not eliminate all of the negative consequences of the former probationer's conviction — for example, as Chatman contends here, former probationers who do not obtain a certificate of rehabilitation have more difficulty in obtaining a community care license — but section 1203.4 certainly provides at least some relief from the consequences of conviction. (See Lab. Code, § 432.7, subd. (a)(1) [prohibiting employers from asking about convictions dismissed under section 1203.4]; Bus. & Prof. Code, § 480, subd. (c) [prohibiting denial of application for license under the Business and Professions Code solely on the basis of a

14

conviction dismissed under section 1203.4].)  Contrasting with what's available to former probationers, relief under section 1203.4 is not available to former prisoners, who are instead limited to seeking relief through the certificate of rehabilitation process.  The Legislature rationally could have taken into account former probationers' lower relative need for certificate of rehabilitation relief when determining which group of petitioners to disqualify from such relief for the sake of preserving government resources.

Second, the timeline by which former probationers obtained the ability to seek certificates of rehabilitation and the larger population of former probationers also distinguish former probationers from former prisoners.  The Legislature created certificates of rehabilitation in 1943, but only for former prisoners.  (Stats. 1943, ch. 400, § 1, p. 1922.)  In 1976, the Legislature extended access to certificates of rehabilitation to former probationers, but only those who are not subsequently incarcerated.  (Stats. 1976, ch. 434, § 2, p. 1111.)  The cost associated with the Legislature's decision to extend the benefit of certificates of rehabilitation to an entirely new group of convicted felons rationally could have driven a decision limiting the expansion of the benefit to only a subset of former probationers — a subset at least marginally more likely to achieve rehabilitation. This limited extension accomplished the goal of increasing the number of people who can receive relief from the effects of their convictions, while avoiding, in a manner not inconsistent with rationality, high costs by not extending that relief to all former probationers.

The legislative history for the 1976 bill and a predecessor bill provide at least some indication that this cost concern figured in legislative deliberations. Two years before former probationers not subsequently incarcerated gained access to certificates of rehabilitation, the Legislature enacted a bill extending this benefit to *all* former probationers.  (Stats. 1974, ch. 1365, § 1.5, p. 2955).  But that bill

15

never became law because the governor vetoed a companion Senate Bill. (Stats. 1974, ch. 1365, § 10, p. 2958 [expressly conditioning the Assembly Bill's effect on passage of Senate Bill].) While vetoing the Senate Bill, the governor made the following statement: "This bill would add considerable unnecessary cost to the state because of the required processing of requests for certificates of rehabilitation and subsequent Governor's pardons by probationers. [¶] The provisions of Section 1203.4 of the Penal Code permit the court to enter a not guilty plea upon the successful completion of probation by an individual and dismiss the information. This is a much simpler method than the costly and time-consuming processing of certificates of rehabilitation and pardons which is used in the case of persons who have been committed to state prison and who have subsequently become law-abiding citizens of our community." (Governor's veto message to Sen. on Sen. Bill No. 2222 (Sept. 27, 1974) 6 Sen. J. (1973-1974 2d Ex. Sess.) p. 14786.) The Legislature then, in 1976, extended the right to obtain certificates of rehabilitation to former probationers, but only those not subsequently incarcerated. (Stats. 1976, ch. 434, § 2, p. 1111.) Although not explicit in this history, costs were likely on the mind of the Legislature when it selectively extended the right to obtain certificates of rehabilitation to some former probationers. (See also Cal. Adult Authority, Enrolled Bill Rep. on Assem. Bill No. 2403 (1975-1976 Reg. Sess.) July 1, 1976, pp. 2-3 [recommending governor veto of the 1976 bill extending certificate of rehabilitation to former probationers not subsequently incarcerated because "[t]he measure greatly expands the eligibility for obtaining certificates of rehabilitation and pardon by including persons who have accusatory pleadings dismissed and persons convicted of a felony, but not sent to state prison. . . . Increased workload generated by this expansion is unknown, but could include many persons from the county level who would become eligible to file with the respective counties and the Governor's

16

Office, a petition for a certificate of rehabilitation and pardon."].) We do not imply that rational basis review requires the Legislature to rely on the rational basis we discuss here. But we find it relevant that administrative costs may have been one driving force for the limitation on subsequently incarcerated former probationers.

Such concerns over preservation of resources proved prescient. Probation is currently the most used criminal sentencing tool for felony convictions in California. In 2014, for example, California courts sentenced approximately 59.5 percent of convicted felons to probation or probation with jail, and only 22.7 percent to confinement in prison or jail alone. (See Criminal Justice Statistics Center, *Crime in California* (2014) Cal. Dept. of Justice, pp. 51 <https:// oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/publications/candd/cd14/cd14.pdf> [as of Feb. 1, 2018].) In the same year, approximately 244,122 felons were on active probation. (*Id.* at p. 54.) In contrast, prisons and jails together had an average daily population of 165,025. (See CDCR Office of Research, *Fall 2014 Population Projections* (Nov. 2014) Cal. Dept. of Corrections and Rehabilitation, p. 9 <http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_ Branch/Projections/F14Pub.pdf> [as of Feb. 1, 2018] [in 2014, 135,484 adults in institutions]; Cal. Board of State and Community Corrections, *Jail Profile Survey: Fourth Quarter Calendar Year 2014 Survey Results* (4th Quarter 2014) p. 2 <http://www.bscc.ca.gov/downloads/2014_4th_Qtr_JPS_Full_Report.pdf> [as of Feb. 1, 2018] [in 2014, 25,005 sentenced males and 4,536 sentenced females in county jails].) These data are at least consistent with the conclusion that more former probationers exist in California than former prisoners. The larger number of former probationers creates a higher relative burden on judicial and executive

17

branch resources that the Legislature rationally could have sought to decrease by limiting former probationers' access to certificates of rehabilitation.**3**

Not only was it within the realm of the term "rational" for the Legislature to limit the number of former probationers who have access to certificates of rehabilitation, but the statutory framework taking account of subsequent incarceration was also rational. As legislators grasped the resource implications of extending eligibility for certificates of rehabilitation, they conceivably recognized the value of a scheme to manage demand for such certificates. Through section 4852.01's bar on eligibility for subsequently incarcerated former probationers, the Legislature extended the possibility of obtaining a certificate of rehabilitation only to those former probationers that could rationally be seen as showing the most promise for rehabilitation. Incarceration may result from a conviction representing a probationer's recidivist behavior, or may result from activity that has little or no bearing on the former probationer's ultimate capacity for rehabilitation. But it would have been at least rational for the Legislature to presume that subsequently incarcerated former probationers are less likely to rehabilitate than those who avoid subsequent incarceration. And it is a simple matter for courts to determine whether a petitioner for a certificate of rehabilitation

---

**3** To be sure, we are not aware of the 1976 Legislature expressing any expectations about the modern ratio of former probationers and former prisoners. But this does not affect the current rationality of the scheme because the Legislature modified section 4852.01 in 2014 and 2015 and took no action to modify the bar on subsequently incarcerated former probationers. (See Stats. 2014, ch. 280, § 3; Stats. 2015, ch. 378, § 6.) Moreover, even if the ratio differed in 1976, the addition of former probationers represented a substantial increase in the number of potential certificate of rehabilitation petitioners that rationally could have caused the Legislature to look for ways of limiting costs. (See Adult Authority Chairman Raymond C. Brown, letter to Herbert E. Ellingwood, Legal Affairs Secretary in Governor's Office, re Assem. Bill No. 3265 (1973-1974 Reg. Sess.) Sept. 4, 1974 [stating that there were "[t]hirty-five thousand (approximate) felony probation grants per year"].)

has been subsequently incarcerated. Although not a perfect proxy for rehabilitation, the "subsequent incarceration" bar at least bears a rational connection to rehabilitation and the preservation of resources.

Section 4852.01's eligibility criteria might not reflect the ideal rehabilitative system. But we cannot cast aside the deferential nature of our inquiry. (*People v. Turnage*, *supra*, 55 Cal.4th at p. 77.) The question we must resolve in this case is whether the Legislature's choices survive rational basis scrutiny. When we analyze this question, we treat the statute's potential logic and assumptions far more permissively than with other standards of constitutional or regulatory review. (*Ibid.* ["When conducting rational basis review, we must accept any gross generalizations and rough accommodations that the Legislature seems to have made."]; *Johnson*, *supra*, 60 Cal.4th at p. 887 ["[T]he Legislature is afforded considerable latitude in defining and setting the consequences of criminal offenses."].) Under this permissive standard, denying subsequently incarcerated former probationers certificates of rehabilitation is sufficiently grounded in distinctions from other classes of convicted felons that it can be considered a rational manner of providing some former probationers a valuable rehabilitative tool in the face of scarce resources.

The rationality of this distribution is further supported by the existence of alternatives to section 1203.4 dismissal potentially available to Chatman and others in his position. Subsequently incarcerated former probationers continue to remain eligible for executive pardons, and the Penal Code makes clear that certificates of rehabilitation are meant to serve as "an additional, but not an exclusive, procedure for the restoration of rights and applications for pardon." (§ 4852.19.) There may be other statutory avenues to obtain the particular real-world benefit the subsequently incarcerated former probationer hopes to obtain. In the context of the community care license that Chatman seeks, for example, the

19

Department of Social Services can "grant an exemption regarding the conviction . . . if the employee or prospective employee has received a certificate of rehabilitation." (Health & Saf. Code, § 1522, subd. (g)(1)(A)(ii).) But that same provision also allows the Department of Social Services to "grant an exemption regarding the conviction . . . if the employee or prospective employee has been rehabilitated as provided in Section 4852.03 of the Penal Code, has maintained the conduct required in Section 4852.05 of the Penal Code for at least 10 years, and has the recommendation of the district attorney representing the employee's county of residence." (*Ibid.*) This alternative pathway features a few of the same requirements as a certificate of rehabilitation, but is available to persons seeking a community care license without having obtained a certificate of rehabilitation. The eligibility criteria in section 4852.01 seem to reflect a rational assumption that creating situation-specific additional exceptions for subsequently incarcerated former probationers is a more cost-effective solution than allowing all subsequently incarcerated former probationers access to certificates of rehabilitation.

Chatman compares the distinction at the heart of section 4852.01 to the one we invalidated in *Newland v. Board of Governor*s (1977) 19 Cal.3d 705 (*Newland*). The Court of Appeal relied heavily on *Newland* as well. The plaintiff in that case, William Newland, had applied for a teaching credential. His application was denied because he had seven years earlier been convicted of misdemeanor lewd conduct in violation of section 647, subdivision (a), and "section 13220.16 of the Education Code barred issuance of a credential to anyone convicted of . . . violations of Penal Code section 647, subdivision (a)." (*Id.* at p. 707.) Before Newland's appeal of that denial was resolved, the Legislature amended section 13220.16 "to remove the bar for anyone found fit to teach provided he met three conditions: he had applied for or obtained a certificate of

rehabilitation under Penal Code section 4852.01, his probation had been terminated, and the information or accusation had been dismissed under Penal Code section 1203.4." (*Ibid.*) Newland satisfied the second and third of those conditions. But he could not satisfy the first condition because certificates of rehabilitation were only available to those convicted of felonies, and Newland had been convicted of a misdemeanor.

Once the statute was amended, the Attorney General did "not attempt to suggest any rational basis for the challenged classification." (*Newland*, *supra*, 19 Cal.3d at p. 713.) To the contrary: the Attorney General "virtually concede[d] that if Education Code section 13220.16 and Penal Code section 4852.01 together work to deny misdemeanants relief available to felons, that discrimination renders either or both statutes unconstitutional." (*Ibid.*) The Attorney General made this argument in order to "propose[] that we construe Penal Code section 4852.01 to permit a convicted misdemeanant who is affected by section 13220.16 to petition for a certificate of rehabilitation," based on "the principle 'that a statute which is reasonably susceptible of two constructions should be interpreted so as to render it constitutional.' " (*Ibid.*) Although we did not use that principle to resolve the case, we acknowledged that the statutory scheme's exclusion of misdemeanants may have been inadvertent. (See *id.* at p. 712 ["[T]he Legislature's insistence in amended section 13220.16 that all persons seeking relief under subdivision (b) of that statute apply for certificates of rehabilitation may simply be a case of legislative oversight — a failure to realize that this requirement would block any relief to a misdemeanant."].) But whatever the explanation for that legislative choice, we reasoned that "[t]he Legislature could not possibly or sensibly have concluded that misdemeanants, as opposed to felons, constitute a class of particularly incorrigible offenders who are beyond hope of rehabilitation." (*Ibid.*) So we held that the statute was unconstitutional. (See *id.* at p. 713 ["[W]hether the

21

result of oversight or intention, the statutory classification discriminating against misdemeanants, lacking a rational relationship to the legislative goals, denies misdemeanants the equal protection of the laws."].)

The requirements invalidated in *Newland* — for which the Attorney General never tried to offer a rational basis, and which we described as so illogical that the nature of their operation appeared inadvertent — were not as minimally rational as section 4852.01's eligibility criteria. The statute at issue in *Newland* barred misdemeanants from teaching while creating an exemption that permitted felons to teach, simply because one of the requirements for triggering the exemption — a certificate of rehabilitation — was only available to felons. We explained that "[t]his statutory discrimination against misdemeanants can claim no rational relationship to the protective purpose of section 13220.16." (*Newland*, *supra*, 19 Cal.3d at p. 712.) Whereas Newland could have obtained a teaching credential if he had simply been convicted of a felony, not a misdemeanor — in other words, if he had been convicted of a more serious offense — Chatman's ineligibility reflects his own response to the unique opportunities he received after he was sentenced to probation. Chatman was eligible for a certificate of rehabilitation up until he was incarcerated for driving under the influence after a court had dismissed his robbery conviction, thus showing less promise for rehabilitation under the metric devised by the Legislature. Until that moment, he had the very same eligibility as other felons.

The statute at issue here — despite any limitations in the persuasive appeal of its underlying policy justification — sits in a different category in comparison to the statute in *Newland*. The distinctions made in section 4852.01's eligibility criteria are rationally related to the legitimate government purpose of preserving government resources by providing certificate of rehabilitation resources only to former prisoners (who have a greater relative need for such relief and a smaller

22

population than former probationers) and former probationers not subsequently incarcerated (who presumably show greater promise for rehabilitation than subsequently incarcerated former probationers). The unequal treatment challenged in this case begins only if a felon reoffends after completing his or her probation. At that point, the Legislature has a rational basis to conclude that resources are better allocated to former prisoners than former probationers. Those former probationers must turn to other pathways to relief, such as an executive pardon or a different statutory exemption.

Chatman emphasizes in his briefing that rehabilitation "is a fundamental value in our justice system," and the "arbitrary technical bar" at issue in this case unfairly denies hundreds of former probationers "a chance for the court to consider their efforts at bettering themselves and their community." Surely much of that is true at some level. Felons endeavoring to improve their lives no doubt deserve a measure of mercy — and we are sensitive to the increasingly troubling fact that the law imposes severe consequences on felony convicts long after they have served their sentence. (See, e.g., *Packingham v. North Carolina* (2017) __ U.S. __ [137 S.Ct. 1730, 1737] [noting the "troubling" fact that a North Carolina statute concerning social media access for registered sex offenders "impose[d] severe restrictions on persons who already ha[d] served their sentence and [we]re no longer subject to the supervision of the criminal justice system"]; *In re J.C.* (2017) 13 Cal.App.5th 1201, 1211 [noting the "substantial — even harsh and severe" nature of many non-penal consequences of a felony conviction].) But our role in this case is to review the rationality of the statutes at issue, not measure their fairness or wisdom. The Legislature may ultimately revisit the statutory framework, especially in light of recent legislation that updates the certificate of rehabilitation scheme to deal with felons imprisoned in county jail under the

23

state's Public Safety Realignment initiative.[4]  Yet even if the Legislature could have chosen to enact a more sensible or judicious statutory scheme than the one in place today, section 4852.01's current eligibility criteria are constitutional because they rationally serve a legitimate government purpose.

---

[4]  Regarding this legislation, Chatman's answer brief in this court contains a claim "in the alternative" that the 2013 enactment of section 1203.41 rendered section 4852.01 unconstitutional.  Section 1203.41 allows for felons imprisoned in county jail to move for dismissal of their convictions.  Although section 1203.41 bears similarities to section 1203.4, a 2016 amendment to section 4852.01 nonetheless clarified that felons whose convictions were dismissed under section 1203.41 are eligible for certificates of rehabilitation even if they are subsequently incarcerated.  (See Stats. 2015, ch. 378, § 6.)  Neither the trial court nor the Court of Appeal addressed this claim about section 1203.41 dismissal, because Chatman never mentioned the claim until his answer brief in this court.  We have previously declined to address new claims related to a statute's amendment that were not raised until the answer brief in this court.  (See *People v. Brown* (2012) 54 Cal.4th 314, 322, fn. 11.)  As in *Brown*, "[t]his new claim is not properly before us, and we do not address it."  (*Ibid.*)

V.

The Legislature enacted a scheme providing relief to former prisoners. It enacted a different, and more restrictive, scheme to govern former probationers' access to certificates of rehabilitation — a scheme applying to individuals who had an alternative process for mitigating the longer-term consequences of their felony convictions. In doing so, legislators weighed the broad class of problems associated with the administrative resources necessary to adjudicate eligibility for certificates of rehabilitation and could have rationally determined that preservation of government resources required the extension of certificates of rehabilitation to only those convicted felons with the highest relative need and those that might sensibly be understood to show the most promise for rehabilitation — former prisoners and former probationers not subsequently incarcerated. That this choice is within the permissible bounds of rational basis review is further evinced by the fact that former probationers outnumber former prisoners, and thus would create a larger burden on state resources. Former probationers remain eligible for other statutory exemptions as well as for pardons, and they remain eligible for certificates of rehabilitation too if they avoid subsequent incarceration. Because section 4852.01's eligibility criteria therefore serve a legitimate government purpose, those criteria are minimally rational enough to withstand rational basis scrutiny. Accordingly, we reverse the judgment of the Court of Appeal.

CUÉLLAR, J.

WE CONCUR:  CANTIL-SAKAUYE, C. J.
                  CHIN, J.
                  CORRIGAN, J.
                  LIU, J.
                  KRUGER, J.
                  MURRAY, J. *

---

\*     Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Chatman

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 2 Cal.App.5th 561
**Rehearing Granted**

_____

**Opinion No.** S237374
**Date Filed:** February 1, 2018

_____

**Court:** Superior
**County:** Alameda
**Judge:** Paul A. DeLucchi

_____

**Counsel:**

David Reagan for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Seth K. Schalit, Kevin Kiley, Donna M. Provenzano, Laurence K. Sullivan and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David Reagan
725 Washington Street, Suite 200
Oakland, CA 94607
(510) 506-9061

Catherine A. Rivlin
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 703-5977