Filed 8/16/24  P. v. Finkelstein CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B330151 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA102284) |
| v. | |
| PATRICK MARTIN FINKELSTEIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Manuel Almada, Judge.  Affirmed.

George L. Schraer for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

# INTRODUCTION

A jury convicted Patrick Martin Finkelstein of vehicular manslaughter while intoxicated pursuant to Penal Code section 191.5, subdivision (b), and found he fled the scene of the accident in violation of Vehicle Code section 20001. Finkelstein contends the trial court erred when it imposed the five-year enhancement under subdivision (c) of Vehicle Code section 20001 (section 20001(c)) for fleeing the scene of the accident rather than the shorter term specified under subdivision (b)(1) of section 20001 (section 20001(b)(1)) for the same conduct. We conclude the trial court did not err, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Finkelstein Hits Patricia O'Donnell with His Car*

At approximately 1:15 a.m. on February 13, 2020, Finkelstein hit and killed Patricia O'Donnell with his Audi A5 as she was riding her skateboard on Pershing Drive in Playa del Rey. Finkelstein slowed, but did not stop, after the collision. He then drove away.

Eric Holm witnessed the accident. Holm testified at trial he heard the roar of the engine as the Audi turned the corner onto Pershing Drive and accelerated down the street. Holm saw Finkelstein's car hit O'Donnell. Holm estimated she flew 20 feet in the air and landed on the curb. At trial, the prosecution played surveillance video from the nearby businesses that supported Holm's testimony.

2

When Holm realized O'Donnell had died and there was nothing he could do for her, he pursued Finkelstein in his car, calling 911 during the chase. When he caught up with Finkelstein, they both pulled over. Holm observed Finkelstein had his window rolled down halfway. Holm screamed, "[G]o back. You have to go back." Finkelstein did not exit his car and drove away after approximately 20 seconds. Holm identified Finkelstein and his car to police officers after Finkelstein was arrested. Finkelstein was taken into custody at 3:59 a.m.

B.    *The Information and the Trial*

An information charged Finkelstein with gross vehicular manslaughter while intoxicated (count 1; Pen. Code, § 191.5, subd. (a)); driving under the influence of alcohol causing injury (count 2; Veh. Code, § 23153, subd. (a)); driving with a blood alcohol level of 0.08 percent causing injury (count 3; Veh. Code, § 23153, subd. (b)); and hit and run driving resulting in death (count 4; Veh. Code, § 20001, subd. (b)(2)). The information further alleged Finkelstein fled the scene after the commission of count 1 in violation of section 20001(c), inflicted great bodily injury during the commission of counts 2 and 3, in violation of Penal Code section 12022.7, subdivision (a), and refused to submit to a chemical test after the commission of counts 2 and 3, in violation of Vehicle Code section 23577.

At trial, the prosecution presented Holm's testimony and surveillance video evidence as described above. The prosecution also presented forensic evidence from Finkelstein's Audi: three swab samples were taken from the vehicle's exterior, and DNA analysis revealed the sample from the right rear window matched O'Donnell's DNA.

3

After his arrest, a police officer conducted a truncated field sobriety test on Finkelstein. The officer testified he smelled alcohol on Finkelstein at 5:30 a.m. and Finkelstein's gaze failed to smoothly track the officer's finger. Finkelstein refused to provide a blood or breath sample to test for alcohol. His blood was drawn pursuant to a warrant at 8:30 a.m. Testing revealed a 0.07 percent blood alcohol level. A criminalist estimated Finkelstein's blood alcohol level at the time of the accident to be 0.14, 0.20, or 0.29 percent, assuming Finkelstein did not consume any alcohol between the time of the incident and when the blood was drawn. The criminalist explained people metabolize alcohol at different rates and the three estimates were based on metabolic rates for the average person and those who metabolized alcohol at faster and slower rates than the average.

The defense attempted to discredit the prosecution's evidence, contending there was insufficient evidence to prove beyond a reasonable doubt Finkelstein was the driver of the Audi, acted with gross negligence, or was driving under the influence at the time of the accident. Finkelstein did not testify. On cross-examination, defense counsel elicited testimony that Holm had smoked marijuana prior to the accident. The defense also attempted to discredit the criminalist's estimation of Finkelstein's blood alcohol level at the time of the incident by highlighting evidence that Finkelstein may have had a drink after he arrived home. Officers observed he had a bottle of vodka on his kitchen counter when they took him into custody.

The defense further presented testimony from an accident reconstructionist and a forensic engineer. The forensic engineer testified to Finkelstein's reaction time given the circumstances surrounding the collision. The engineer explained the collision

4

took place in a bright spot of light and, if O'Donnell's back was toward Finkelstein, he was unlikely to see her in time to stop. After viewing the videos of the accident, the accident reconstructionist calculated Finkelstein's speed to range from 24 to 43.5 miles per hour. He also estimated O'Donnell's speed to be four and a half to five miles per hour. According to the defense, these facts showed Finkelstein did not act with gross negligence.

C.    *Verdict and Sentence*

The jury found Finkelstein guilty of vehicular manslaughter while intoxicated in violation of Penal Code section 191.5, subdivision (b), a lesser-included offense of gross vehicular manslaughter while intoxicated under subdivision (a) of that section. It also found true Finkelstein fled the scene of the offense in violation of section 20001(c). The jury found Finkelstein guilty as charged as to counts 2 and 4, and not guilty as to count 3.

The trial court sentenced Finkelstein to a total of six years and four months in state prison, comprised of the low term of 16 months on count 1, plus five years for the section 20001(c) enhancement. The trial court dismissed count 2 pursuant to Penal Code section 1385 because it was a lesser-included offense of count 1. It imposed and stayed a two-year term for count 4 pursuant to Penal Code section 654.

Finkelstein timely appealed.

**DISCUSSION**

Finkelstein's sole challenge is to the five-year sentence enhancement imposed pursuant to section 20001(c). He contends he should be resentenced under section 20001(b)(1), which provides a sentencing triad for felony hit and run offenses of 16 months or two or three years, rather than the mandatory five-year enhancement under section 20001(c).[1] He contends the disparate punishment for identical conduct is contrary to the legislative intent underlying Vehicle Code section 20001, and also violates equal protection and due process principles.[2]

---

[1] Section 20001(b)(1) requires punishment by "imprisonment in the state prison, or in a county jail for not more than one year, or by a fine of not less than one thousand dollars ($1,000) nor more than ten thousand dollars ($10,000), or by both that imprisonment and fine." Section 20001(b)(1) is a wobbler offense. "Wobblers" are crimes that "are chargeable or, in the discretion of the court, punishable as either a felony or a misdemeanor; that is, they are punishable either by a term in state prison or by imprisonment in county jail and/or by a fine." (*People v. Park* (2013) 56 Cal.4th 782, 789.) When a statute, such as section 20001(b)(1), makes an offense punishable by imprisonment in the state prison but does not state a sentence range, then the determinate sentence range is 16 months, two years, or three years. (See Pen. Code, § 18; *People v. Torres* (2011) 198 Cal.App.4th 1131, 1138.)

[2] Finkelstein also suggests he challenges the proportionality of his sentence under the Eighth Amendment: "The sentence that appellant is serving for leaving the scene of the accident is more than three times as long as the sentence appellant is serving for causing Ms. O'Connell's [*sic*] death." He concedes, however, that "these provisions are generally reserved for

A. *The Trial Court Properly Sentenced Finkelstein Under Section 20001(c)*

1. *Standard of Review*

We review questions of statutory construction de novo. (See *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.) "'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose."'" (*City of*

---

egregious cases of disproportionality and unfairness and not for a case like appellant's." Given Finkelstein's concession and his failure to develop or provide any legal authority for this argument, we conclude he has forfeited the issue. (See *Golden Door Properties, LLC v. Superior Court* (2020) 53 Cal.App.5th 733, 786 [issues not addressed as error in a party's brief with legal analysis and citation to authority are forfeited]; *Lee v. Kim* (2019) 41 Cal.App.5th 705, 721 ["our review is limited to those issues that have been adequately raised and supported in the appellant's brief"].)

7

*San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616-617 (*City of San Jose*).)

    2.    *Vehicle Code Section 20001*

"Section 20001 addresses two types of penalties for leaving the scene of a vehicular accident; one is a substantive offense and the other is an enhancement for vehicular manslaughter. Subdivisions (a) and (b) of section 20001 proscribe a substantive offense often referred to as felony hit and run." (*People v. Nordberg* (2010) 189 Cal.App.4th 1228, 1236-1237 (*Nordberg*).)

Subdivision (a) of Vehicle Code section 20001 (section 20001(a)) provides: "The driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of Sections 20003 and 20004." Vehicle Code section 20003 requires a driver of a vehicle involved in an accident resulting in injury or death to provide identifying information and render aid to any of the injured. Vehicle Code section 20004 requires a driver to report an accident resulting in death to authorities.

Subdivision (b) of Vehicle Code section 20001 sets out the potential determinate sentences for a violation of section 20001(a). As stated, Section 20001(b)(1) provides for "imprisonment in the state prison, or in a county jail for not more than one year, or by a fine of not less than one thousand dollars ($1,000) nor more than ten thousand dollars ($10,000), or by both that imprisonment and fine." And the sentence range for this wobbler as a felony is not otherwise specified, so it is 16 months, two or three years. (See Pen. Code, § 18.) If the accident results

8

in death or permanent, serious injury, Vehicle Code section 20001, subdivision (b)(2), specifies a sentence of "imprisonment in the state prison for two, three, or four years, or in a county jail for not less than 90 days nor more than one year, or by a fine of not less than one thousand dollars ($1,000) nor more than ten thousand dollars ($10,000), or by both that imprisonment and fine.  However, the court, in the interests of justice and for reasons stated in the record, may reduce or eliminate the minimum imprisonment required by this paragraph."

By contrast, section 20001(c) is "conceptually related" but is a "sentence enhancement."  (*Nordberg, supra*, 189 Cal.App.4th at p. 1237.)  Section 20001(c) mandates a consecutive five-year sentence enhancement for "[a] person who flees the scene of the crime after committing" vehicular manslaughter in violation of Penal Code sections 191.5 or 192, subdivision (c)(1).  "This additional term shall not be imposed unless the allegation is charged in the accusatory pleading and . . . found to be true by the trier of fact.  The court shall not strike a finding that brings a person within the provisions of this subdivision or an allegation made pursuant to this subdivision."  (§ 20001(c).)  There is no requirement that the driver render aid, or provide identification, as required in section 20001(a).  (See *People v. Vela* (2012) 205 Cal.App.4th 942, 950 (*Vela*).)

The legislative history of section 20001(c) reveals it was "enacted in memory of 15-year-old Courtney Cheney, killed by a recidivist drunk driver who fled the scene.  (Stats. 1996, ch. 654, § 1; Sen. Com. on Crim. Proc., Analysis of Assem. Bill No. 1985 (1995-1996 Reg. Sess.) as amended July 1, 1996, pp. 3-4.)  The Senate committee report pointed out that the enhancement was

9

necessary 'because when a person who is DUI flees the scene of an accident where a death has occurred and they are not caught immediately, it is hard if not impossible to later prove that they were DUI.  This [enhancement] will create an added deterrence to keep people from fleeing accidents where a death may have occurred.'  (Sen. Com. on Crim. Proc., Analysis of Assem. Bill No. 1985, *supra,* at p. 6.)."  (*People v. Calhoun* (2007) 40 Cal.4th 398, 404 (*Calhoun*).)

"[U]nlike the substantive crime in subdivisions (a) and (b) of Vehicle Code section 20001, the purpose and gravamen of the enhancement" in subdivision (c) "is not to compel motorists to stop, provide identification information and render assistance; it is to preserve evidence of a DUI and to act as a deterrent."  (*Vela, supra,* 205 Cal.App.4th at p. 950.)

3.    *Analysis*

Finkelstein does not dispute the plain language of section 20001(c) mandates imposition of a five-year enhancement because the information charged him with a violation of that subdivision, he was convicted of the predicate offense—vehicular manslaughter under Penal Code section 195.1—and the jury found true that he fled the scene.  The language of section 20001(c) is clear, and we "must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend."  (*City of San Jose, supra,* 2 Cal.5th at p. 616.)

Finkelstein argues applying section 20001(c) in his case leads to consequences the Legislature did not intend.  Relying on *People v. Martinez* (2017) 2 Cal.5th 1093, 1102, Finkelstein contends the conduct the Legislature sought to punish when it

enacted Vehicle Code section 20001, commonly known as the hit and run statute, "is not the hitting but the running."  Finkelstein argues, "Section 20001 as currently written violates this fundamental purpose of punishing the act of leaving and not punishing the offense that causes the collision.  In its current form, section 20001 violates this principle by punishing defendants whose act of leaving the scene is identical, but whose underlying crimes differ in severity."  This contention is unpersuasive.

Applying section 20001(c) to Finkelstein's case complies with the Legislature's intent in enacting this subdivision.  Indeed, this case underscores the Legislature's concerns about DUI evidence.  Finkelstein was arrested approximately three hours after the accident.  He refused toxicology tests and his blood was not drawn until 8:30 a.m., approximately seven hours after the accident and after the police obtained a search warrant.  Given this length of time, the criminalist could only estimate his blood alcohol level at the time of the accident ranged from 0.14 percent to 0.29 percent, a two-fold difference.  Finkelstein "could have escaped detection and remained in hiding until [his] level of intoxication could no longer reliably be determined.  This potential loss of evidence is precisely what the statute is intended to deter."  (*Vela, supra*, 205 Cal.App.4th at p. 951.)

B.    *Vehicle Code Section 20001 Does Not Violate Equal Protection Principles*

1.    *Equal Protection and the Standard of Review*

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of

the laws." (U.S. Const., 14th Amend.) The California Constitution likewise guarantees equal protection of the law. (Cal. Const., art. I, § 7, subd. (a).) "At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification." (*People v. Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*).)

"The degree of justification required to satisfy equal protection depends on the type of unequal treatment at issue. Courts apply heightened scrutiny when a challenged statute or other regulation involves a suspect classification such as race, or a fundamental right such as the right to vote, and accordingly will demand greater justification for the differential treatment. [Citations.] But when a statute involves neither a suspect classification nor a fundamental right, the 'general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.' [Citations.] A court applying this standard finds 'a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose.'" (*People v. Hardin* (2024) 15 Cal.5th 834, 847 (*Hardin*).)

In *Hardin, supra,* 15 Cal.5th at pages 850 to 851, the high court held that when "plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question. The only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review."

12

Here, the parties agree the rational basis standard of review applies. We agree; there is no contention Vehicle Code section 20001 involves a suspect classification or a fundamental right. Indeed, a defendant "'does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives.'" (*People v. Wilkinson* (2004) 33 Cal.4th 821, 838 (*Wilkinson*).)

"Rational basis review 'sets a high bar' for litigants challenging legislative enactments." (*Hardin, supra,* 15 Cal.5th at p. 852.) "Under this deferential standard, we presume that a given statutory classification is valid 'until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable.' The underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must 'treat the statute's potential logic and assumptions far more permissively than with other standards of constitutional or regulatory review.' 'If a plausible basis exists for the disparity, courts may not second-guess its "wisdom, fairness, or logic."'' '[T]he logic behind a potential justification need [not] be persuasive or sensible—rather than simply rational.'" (*Ibid.*, citations omitted.)

We review equal protection claims de novo. (See *California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 208; *In re Murray* (2021) 68 Cal.App.5th 456, 463.)

2.      *Analysis*

Finkelstein argues the longer sentence for a violation of section 20001(c) has no rational basis because it is inconsistent

13

with "the exclusive and single purpose of section 20001 of discouraging and punishing fleeing." Finkelstein presumes the disparity in punishment between Vehicle Code section 20001, subdivisions (a) and (b), on the one hand, and subdivision (c), on the other, rests on the different underlying offenses—the "hitting"—connected to the hit and run statute. In his view: "Section 20001 violates equal protection because it provides for three different possible punishments based on differences in the nature of the hitting and not based on any differences in the nature of the running."

Even if Finkelstein's presumption were true, he has presented no authority precluding the Legislature from treating the different predicate offenses differently.[3] Finkelstein's argument is undermined by the Supreme Court's recognition that "[i]t is both the prerogative and the duty of the Legislature to define degrees of culpability and punishment, and to distinguish between crimes in this regard. [Citation.] Courts routinely decline to intrude upon the 'broad discretion' such policy judgments entail. [Citation.] Equal protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law." (*People v. Turnage* (2012) 55 Cal.4th 62, 74; accord, *Hardin, supra,* 15 Cal.5th at p. 853.)

---

[3]     We observe the plain language of Vehicle Code section 20001 belies Finkelstein's assumption that the subdivisions punish identical conduct differently. Section 20001(a) requires a driver to stop, provide identifying information, and render aid. Section 20001(c), on the other hand, prohibits a driver from fleeing the scene of an accident involving death or serious permanent injury but does not require he or she provide aid or information.

14

In any event, the legislative history for Vehicle Code section 20001 does not support Finkelstein's assertion that the sole purpose of section 20001 is to deter flight from the scene of the crime. The Supreme Court has long recognized that "[l]egislation is frequently the '"product of multiple and somewhat inconsistent purposes that led to certain compromises."'" (*Hardin, supra,* 15 Cal.5th at p. 854, quoting *Hernandez v. City of Hanford* (2007) 41 Cal.4th 279, 300.)

While "the state has a valid interest in requiring that principals in the commission of serious vehicular crimes remain at the scene," that is not the only purpose for Vehicle Code section 20001's enactment. (*Calhoun, supra,* 40 Cal.4th at p. 405.) The Legislature additionally recognized, by enacting section 20001(c), the need for preservation of DUI evidence "'"because when a person who is DUI flees the scene of an accident where a death has occurred and they are not caught immediately, it is hard if not impossible to later prove that they were DUI."'" (*Vela, supra,* 205 Cal.App.4th at p. 950.) Preservation of DUI evidence provides a rational basis for the disparate sentences set out in subdivisions (b) and (c) of section 20001.

C. *Vehicle Code Section 20001 Does Not Violate Due Process Principles*

Nor are we persuaded that Vehicle Code section 20001 violates due process principles. Finkelstein argues the disparate sentences specified in section 20001 allow for arbitrary enforcement of identical conduct.

We reject Finkelstein's contention that his due process rights were violated because Vehicle Code section 20001 allows

15

the prosecutor to arbitrarily charge him with an enhancement that carries a longer sentence when an identical offense carries a shorter sentence.  As we have observed, sections 20001(a) and 20001(c) do not address identical conduct.

In any event, the United States Supreme Court and the California Supreme Court have held that the existence of two identical criminal statutes prescribing different levels of punishments and the exercise of a prosecutor's discretion in charging under one such statute and not the other, does not violate equal protection or due process principles absent a showing the prosecution's exercise of discretion had been "'based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" (*United States v. Batchelder* (1979) 442 U.S. 114, 125, fn. 9; accord, *Wilkinson, supra,* 33 Cal.4th at p. 838.)  Finkelstein does not argue, much less demonstrate, any such arbitrary classification underlying Vehicle Code section 20001.  As stated, the Legislature had a rational basis in distinguishing between a hit and run offense and a hit and run sentencing enhancement and in proscribing different sentences for each.

Moreover, the cases cited by Finkelstein for his due process argument—*Wolff v. McDonnell* (1974) 418 U.S. 539, 544, and *Gilbert v. Homar* (1997) 520 U.S. 924, 930—are distinguishable.  Both *Wolff* and *Gilbert* address the notice and hearing procedures required to satisfy due process concerns in the deprivation of certain private interests.  (*Wolff,* at p. 544 [inmate faced loss of good-time custody credits without notice, hearing, or written statement of findings]; *Gilbert,* at p. 935 [employee faced a temporary, unpaid suspension without a hearing].)  Neither *Wolff*

16

nor *Gilbert* help Finkelstein because he does not identify any similar deficiencies in the proceedings against him.

## DISPOSITION

The judgment is affirmed.

MARTINEZ, P. J.

We concur:

SEGAL, J.

STONE, J.