Filed 11/9/23  P. v. Rios CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JUAN CARLOS RIOS,<br><br>        Defendant and Appellant. | B326828<br><br>(Los Angeles County<br>Super. Ct. No. VA091171) |

APPEAL from an order of the Superior Court of Los Angeles County, Andrew C. Kim, Judge.  Reversed and remanded with directions.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

————————————

Juan Carlos Rios was convicted by a jury in February 2009 of special-circumstance first degree murder and other crimes committed when he was 23 years old. Rios was sentenced on the murder count to life without the possibility of parole (LWOP). Rios appealed, and we affirmed. (*People v. Rios* (May 18, 2011, B218445) [nonpub. opn.] (*Rios I*).)

On October 31, 2022 Rios, representing himself, filed a motion seeking to develop a record of his youth-related mitigating factors for an eventual youth offender parole hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*) and *In re Cook* (2019) 7 Cal.5th 439 (*Cook*) (*Franklin* proceeding). In his motion, Rios argued Penal Code section 3051, subdivision (h),[1] of the youth offender parole hearing statute violated the equal protection clause of the Fourteenth Amendment by denying the right to a youth offender parole hearing to inmates sentenced to LWOP for crimes committed when they were 18 to 25 years old, while authorizing youth offender parole hearings for similarly situated young adults who were sentenced to an indeterminate term. The trial court summarily denied the motion on the basis that Rios was statutorily ineligible for a youth offender parole hearing.

On appeal, Rios contends section 3051, subdivision (h), violates the equal protection clause because there is no rational basis for excluding 18-to 25-year-old offenders sentenced to LWOP from the benefits of section 3051. For the reasons expressed in our opinion in *People v. Hardin* (2022) 84 Cal.App.5th 273 (*Hardin*), review granted Jan. 11, 2023, S277487, we agree with Rios. We also reject the People's

---

[1] All statutory references are to the Penal Code.

alternative contention that there is no equal protection violation because Rios was also ineligible for the benefits of section 3051 because he was sentenced under the three strikes law. (§§ 667, subds. (b)-(i), 1170.12; see § 3051, subd. (h).) Accordingly, we reverse and remand with directions for the trial court to schedule a hearing so that Rios may present information concerning his youth-related mitigating factors.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Killing*

Early on the morning of June 17, 2005, Alex Gutierrez drove to a house on Clarkdale Avenue in Hawaiian Gardens, where Lizbeth Figueroa and her sister Paola Figueroa lived with their family.[2]  Gutierrez was a friend of Paola's ex-boyfriend. Paola reluctantly agreed to sell stereo speakers for Gutierrez. Lizbeth and Paola drove to a house about five blocks away to try to sell the speakers.  One of Lizbeth's friends, Carlos Gallardo, was there with five or six other men.  Gallardo was a member of the Varrio Hawaiian Gardens gang, and the house was a regular hangout for members of the gang.  Rios, who was a member of the same gang, approached the women and demanded to know who gave Paola the speakers.  Paola replied that it was "just some friends."  Rios asked if they were "gangsters" and whether they had guns, a nice car, and money.  He also inquired whether they looked like "Paisa[s]," meaning Mexican nationals.  Paola told Rios they were Paisas and had no money.  Rios responded he

---

[2]    The summary of facts is taken from our prior opinion in *People v. Rios* (May 18, 2011, B218445) [nonpub. opn.] (*Rios I*).

3

"was planning on jacking them." Paola later drove Rios, Gallardo, and Omar Ramirez to Rios's home, which was close to where the Figueroa sisters lived.

At around 3:00 a.m. Gutierrez and David Quesada drove to Lizbeth and Paola's house for Gutierrez to pick up money for what he described as a completed job. Rios, Gallardo, and Ramirez were near the house when they saw Gutierrez's car make a U-turn and come to a stop on the street. Gallardo thought the occupants of the car looked like Paisas. Rios, wearing a hockey mask, approached the driver's side of Gutierrez's car and asked Gutierrez for a cigarette. Gutierrez said he did not have one. Rios whistled, and Gallardo and Ramirez, whose faces were covered, ran to the passenger's side of the car from behind a nearby van. Rios drew a gun and told Gutierrez to park the car and get out. Rios told Quesada in Spanish that nothing would happen to him if he got out of the car. Quesada started to get out of the car.

Rios argued with Gutierrez, who then began to drive away. Rios fired several shots at the car. One of the bullets struck Gutierrez, who lost control of the vehicle. The car hit a van that was parked in front of the Figueroas' house. Gutierrez later died from a gunshot wound to his torso.

B.    *The Jury Conviction and Sentence*

A jury convicted Rios of first degree murder (§ 187, subd. (a)), attempted willful, deliberate and premeditated murder (§§ 187, subd. (a), 664), shooting at an occupied vehicle (§ 246), two counts of attempted carjacking (§§ 215, subd. (a), 664), and two counts of possession of a firearm by a felon (former § 12021, subd. (a)(1).) The jury also found the special circumstance

4

allegation true that the murder was committed while Rios was engaged in the attempted carjacking and to further the activities of a criminal street gang (§ 190.2, subd. (a)(17) & (22)), that he and a principal personally used and discharged a firearm during the commission of the murder, causing great bodily injury (§ 12022.53, subds. (b), (c), (d) & (e)), and that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  The trial court found true the allegation Rios had one prior serious felony conviction within the meaning of section 667, subdivision (a)(1).

The trial court sentenced Rios to LWOP for first degree murder, a consecutive sentence of 30 years to life for the attempted murder (15 years doubled under the three strikes law), and a concurrent term of four years for possession of a firearm (the middle term of two years doubled).  The trial court also imposed consecutive 25-years-to-life terms for the firearm use enhancements on the murder and attempted murder counts, and five years for the prior serious felony conviction.  The court stayed the sentences on the remaining counts and enhancements.

C.    *Rios's* Franklin *Motion*

On October 31, 2022 Rios, representing himself, filed a motion seeking to develop a record for an eventual youth offender parole hearing.  In his motion Rios argued he was 23 years old at the time of the offenses and section 3051, subdivision (h), violated the equal protection clause of the Fourteenth Amendment by denying defendants sentenced to LWOP for crimes committed when they were 18 to 25 years old the right to a youth offender parole hearing while authorizing the hearings for similarly

5

situated individuals "who have been sentenced to the functional equivalent to [LWOP]."

On November 8, 2022 the trial court summarily denied Rios's request for a *Franklin* proceeding. The trial court found that Rios was statutorily ineligible for a youth offender parole hearing "because (1) he was sentenced pursuant to sections 1170.12 and 667(b) through (i) for a prior serious 'strike' conviction and (2) he received a life without the possibility of parole sentence for a controlling offense (namely, first degree murder committed while engaged in an attempted carjacking and to further the activities of a criminal street gang), which he committed when he was 23 years old." Rios timely appealed.

## DISCUSSION

A. *Youth Offender Parole Hearings*

In 2013, the California Legislature enacted Senate Bill No. 260 (2013-2014 Reg. Sess.), which added section 3051 and amended sections 3041, 3046, and 4801, effective January 1, 2014. Section 1 of the bill states, "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262, and the decisions of the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, and *Miller v. Alabama* (2012) [567 U.S. 460] . . . . It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a

6

meaningful opportunity for release established."[3] (Stats. 2013, ch. 312, § 1; see *In re Williams* (2020) 57 Cal.App.5th 427, 431 ["Youth offender parole hearings under section 3051 were established by the Legislature in 2013, following a series of United States and California Supreme Court cases addressing the constitutionality of lengthy prison sentences for juvenile offenders."].)

Section 3051 initially applied to offenses committed before the offender turned 18 years old and required the Board of Parole Hearings, with limited exceptions, to conduct a youth offender parole hearing no later than a juvenile offender's 25th year of incarceration (and at earlier points depending on the offender's "controlling offense").[4] (See *People v. Ochoa* (2020) 53 Cal.App.5th 841, 848.) Section 4801, subdivision (c), directed the Board of Parole Hearings, when considering parole eligibility

---

[3] In *Graham v. Florida, supra,* 560 U.S. 48, the United States Supreme Court determined that LWOP sentences for nonhomicide offenses committed by juvenile offenders violated the Eighth Amendment prohibition against cruel and unusual punishment. In *Miller v. Alabama, supra,* 567 U.S. 460, the Supreme Court extended the holding of *Graham* to include juvenile homicide offenders given mandatory LWOP sentences. In *People v. Caballero, supra,* 55 Cal.4th 262, the California Supreme Court held, in the context of a 110-years-to-life sentence imposed on a juvenile for nonhomicide offenses, that parole-eligible sentences for juvenile offenders violated the Eighth Amendment if the parole eligibility date falls beyond the offender's natural life expectancy.

[4] "Controlling offense" refers to "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).)

for youth offenders, to "give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity."

Section 3051 was subsequently amended to apply to offenders who had committed the controlling offense before the age of 23 (Stats. 2015, ch. 471, § 1), and later to offenders who committed the controlling offense when 25 years old or younger (Stats. 2017, ch. 684, § 1.5). In addition to raising the threshold age to 25, the Legislature extended youth parole hearings in the 25th year of incarceration to juveniles sentenced to LWOP for a controlling offense committed before the age of 18. (§ 3051, subd. (b)(4), added by Stats. 2017, ch. 684, § 1.5; see *People v. Contreras* (2018) 4 Cal.5th 349, 381.) Section 3051, subdivision (h), expressly excludes from eligibility for a youth offender parole hearing cases in which the sentence was imposed pursuant to the three strikes law (§§ 667, 1170.12, subds. (b)-(i)), the one strike law (§ 667.61), "or to cases in which an individual was sentenced to life in prison without the possibility of parole." (Stats. 2013, ch. 312, § 4.)

Following the enactment of section 3051, *Franklin, supra*, 63 Cal.4th 261, established a procedure by which an inmate at the time of sentencing may make a record of youth-related mitigating factors in anticipation of a future youth offender parole hearing under section 3051.[5] The Court in *Cook*, *supra*,

---

[5] As the *Franklin* court explained, "[S]ection 3051, subdivision (f)(2) provides that '[f]amily members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime . . . may submit statements for review by the board.' Assembling such statements 'about the individual before the crime' is typically a task more easily done at or near the time of

7 Cal.5th at page 458 held that a juvenile offender with a final judgment could move in a postjudgment proceeding under section 1203.01 to present evidence of youth-related factors.

B.     *Equal Protection Analysis*

Both the federal and California Constitutions guarantee individuals the equal protection of the laws.  (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7; see *People v. Chatman* (2018) 4 Cal.5th 277, 287.)  "The concept of equal treatment under the laws means that persons similarly situated regarding the legitimate purpose of the law should receive like treatment.  [Citation.]  '"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner."  [Citations.]  This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged."'"  (*People v. Morales* (2016) 63 Cal.4th 399, 408; accord, *People v. Foster* (2019) 7 Cal.5th 1202, 1211-1212.)

---

the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away.  In addition, section 3051, subdivision (f)(1) provides that any 'psychological evaluations and risk assessment instruments' used by the Board in assessing growth and maturity 'shall take into consideration . . . any subsequent growth and increased maturity of the individual.'  Consideration of 'subsequent growth and increased maturity' implies the availability of information about the offender when he was a juvenile." (*Franklin, supra,* 63 Cal.4th at pp. 283-284.)

As we explained in *Hardin, supra*, 84 Cal.App.5th at pages 283 to 284, review granted, "'The next step of an equal protection analysis asks whether the disparate treatment of two similarly situated groups is justified by a constitutionally sufficient state interest. [Citation.] Varying levels of judicial scrutiny apply depending on the type of claim. "[M]ost legislation is tested only to determine if the challenged classification bears a rational relationship to a legitimate state purpose." [Citation.] However, differences "in statutes that involve suspect classifications or touch upon fundamental interests are subject to strict scrutiny, and can be sustained only if they are necessary to achieve a compelling state interest."'" (Quoting *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1107.)[6]

---

[6] On October 4, 2023 the Supreme Court in *Hardin, supra*, S277487, directed the parties to file supplemental briefs addressing "[w]hether the first step of the two-part inquiry used to evaluate equal protection claims, which asks whether two or more groups are similarly situated for the purposes of the law challenged, should be eliminated in cases concerning disparate treatment of classes or groups of persons, such that the only inquiry is whether the challenged classification is adequately justified under the applicable standard of scrutiny." (See *Conservatorship of Eric B.*, *supra*, 12 Cal.5th at p. 1108 (conc. opn. of Kruger, J.) ["The simple fact that a law differently benefits or burdens two identifiable groups is—or at least ought to be—sufficient reason for us to examine whether the difference in treatment is consistent with equal protection. To the extent our cases have taken a different approach, it is probably time to reevaluate."].) The Supreme Court has also granted review in *People v. Williams* (2020) 47 Cal.App.5th 475, 493, review granted July 22, 2020, S262229, to decide whether section 3051, subdivision (h), violates the equal protection clause by excluding from youth offender parole consideration young adults who have

"If we deem the groups at issue similarly situated in all material respects, we consider whether the challenged classification ultimately bears a rational relationship to a legitimate state purpose." (*People v. Chatman, supra*, 4 Cal.5th at p. 289; see *Hardin, supra*, 84 Cal.App.5th at p. 283, review granted.) Pursuant to rational relationship review, the challenged statute only denies equal protection of the law where the challenger shows there is no reasonably conceivable rational basis for the disparity of treatment. (*Chatman*, at p. 289; *Hardin* at p. 284.)

C.    *Section 3051, Subdivision (h), Violates Rios's Right to Equal Protection Under* People v. Hardin

In *Hardin*, we considered whether section 3051, subdivision (h), violated equal protection in treating young adult offenders between 18 and 25 years old who committed a special-circumstance murder and were sentenced to life without parole differently from other young adult offenders in the same age group who committed serious or violent crimes and received parole-eligible indeterminate life sentences, including those that were the functional equivalent of a life without parole sentence.

While acknowledging that "individuals who commit different offenses are not similarly situated for many purposes" (*Hardin, supra*, 84 Cal.App.5th at p. 286, review granted), we explained that the purpose of section 3051 "was not to assess culpability or measure the appropriate level of punishment for various crimes, but 'to account for neuroscience research that the

been convicted and sentenced for serious sex crimes under the one strike law (§ 667.61).

11

human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20's.'" (*Hardin*, at p. 287; accord, *People v. Acosta* (2021) 60 Cal.App.5th 769, 779 ["'"[t]he purpose of section 3051 is not to measure the extent of punishment warranted by the offense the individual committed but to permit the evaluation of whether, after years of growth in prison, that person has attained the maturity to lead a law-abiding life outside of prison."'"] Therefore, "an individual serving a parole-eligible life sentence and a person who committed an offense at the same age serving a sentence of life without parole are similarly situated." (*Hardin*, at p. 287.)

We next considered in *Hardin* whether there was any plausible rational basis for distinguishing between a young adult offender sentenced to life without parole and other young adult offenders sentenced to parole-eligible life sentences for purposes of section 3051. We concluded there was not, explaining, "[I]f, as the legislature stated, the goal of section 3051 was to apply the [*Miller v. Alabama, supra*, 567 U.S. 460] youth-related mitigating factors to young adults up to the age of 26 in light of neuroscience research that demonstrated the human brain continues to develop into a person's mid-20's, and thus to permit youth offenders a meaningful opportunity for parole if they demonstrate increased maturity and impulse control, then for that purpose there is no plausible basis for distinguishing between same-age offenders based solely on the crime they commit." (*Hardin, supra*, 84 Cal.App.5th at p. 288, review granted.) We explained that "while for some purposes it might be reasonable to view special circumstance murder differently from murder with no special circumstance finding, that is not a rational basis for the

12

distinction in eligibility for a youth offender parole hearing made by section 3051." (*Id*. at p. 290.) Accordingly, "[a]bsent a rational basis for that exclusion, the disparate treatment of offenders like Hardin cannot stand." (*Id*. at p. 291.)

The People argue that *Hardin* was incorrectly decided and urge us to follow the cases that have found no equal protection violation, including *People v. Ngo* (2023) 89 Cal.App.5th 116, 125, review granted May 17, 2023, S279458 [disagreeing with *Hardin* that there was an equal protection violation, explaining "the 'rational basis' inquiry is *not* limited to the purposes of the challenged law"]; *People v. Sands* (2021) 70 Cal.App.5th 193, 203 [section 3051 does not violate equal protection because "there is a rational basis for the disparate treatment"]; *People v. Morales* (2021) 67 Cal.App.5th 326, 349 ["there is a rational basis for the Legislature's decision to treat youthful offenders sentenced to LWOP differently than youthful first degree murderers not sentenced to LWOP based on public safety concerns and the desire to punish those who commit special circumstance multiple murder more harshly than those who commit first degree murder without such aggravating circumstances"]; *People v. Jackson* (2021) 61 Cal.App.5th 189, 200 ["Given the deferential standard we apply in determining rationality for equal protection purposes, we conclude public safety, and the desire to punish those persons who commit first degree special circumstance murder more harshly than persons who commit first degree murder without aggravating circumstances, provide a plausible basis for our Legislature to treat these two classifications differently for purposes of section 3051."]; *People v. Acosta, supra* 60 Cal.App.5th at p. 780 ["There is also a rational basis for distinguishing between a young adult LWOP offender and a

13

young adult offender serving a non-LWOP sentence: the severity of the crime committed."]; and *In re Williams*, *supra*, 57 Cal.App.5th at p. 436 ["In excluding LWOP inmates from youth offender parole hearings, the Legislature reasonably could have decided that youthful offenders who have committed such crimes—even with diminished culpability and increased potential for rehabilitation—are nonetheless still sufficiently culpable and sufficiently dangerous to justify lifetime incarceration."]. Notwithstanding the cases cited by the People, we do not find the arguments made by the People persuasive.  In the light of section 3051's stated purpose, unless the Supreme Court directs us otherwise, we decline the People's invitation to deviate from our holding in *Hardin*.  (*Hardin, supra*, 84 Cal.App.5th at p. 289, review granted.)

Finally, the People contend in the alternative that, even if we continue to follow our decision in *Hardin*, we should affirm because Rios was ineligible for a *Franklin* proceeding because he was sentenced under the three strikes law, citing recent cases that have not found an equal protection violation.  (See *People v. Moore* (2021) 68 Cal.App.5th 856, 864 ["we conclude the differential treatment of youth offenders sentenced under the Three Strikes law for purposes of early parole consideration for youth offenders is rationally related to the legitimate governmental purpose of addressing recidivism"]; *People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1166 ["Assuming a Three Strikes youth offender is similarly situated to other youth offenders for purposes of section 3051, the Legislature could rationally determine that the former—'a recidivist who has engaged in significant antisocial behavior and who has not benefited from the intervention of the criminal justice system' [citation]—

presents too great a risk of recidivism to allow the possibility of early parole."].)

The People argue there is a rational basis for treating young adult offenders sentenced under the three strikes law differently because the three strikes law applies to more dangerous recidivists with prior serious or violent felony convictions. But, like an LWOP sentence, the imposition of a three-strikes sentence is based on the crimes committed by the offender, not his or her maturity or impulse control. As we reasoned in *Hardin* with respect to young adult offenders sentenced to LWOP, the goal in enacting section 3051 was to apply youth mitigating factors to young adults in light of neuroscience research showing the human brain continues to develop into a person's mid-20's, and on that basis to allow youth offenders "a meaningful opportunity for parole if they demonstrate increased maturity and impulse control." (*Hardin, supra*, 84 Cal.App.5th at p. 288, review granted.) Thus, there was no plausible reason to distinguish between offenders of the same age based solely on the crimes they committed. (*Ibid.*) Similarly, given the goal of section 3051, there is no reason to distinguish between young adult offenders of the same age based on whether the crimes they committed fell within the three strikes law or another sentencing scheme.[7] (*Id.* at p. 289 ["By

[7] We decline to find, as requested by the People, that Rios has forfeited the argument his three-strikes sentence made him ineligible for the benefits of section 3051. (See *People v. Heard* (2022) 83 Cal.App.5th 608, 626-627 [court exercised its discretion to consider equal protection challenge because "'appellate courts have discretion to address constitutional issues raised on appeal' where, as here, 'the issue presented is "a pure question of law" turning on undisputed facts'"]; see also *People v. Williams* (1998)

defining the youth parole eligible date in terms of a single 'controlling offense,' rather than by the offender's aggregate sentence, the Legislature has eschewed any attempt to assess the offenders' overall culpability, let alone his or her amenability to growth and maturity."].)

Because Rios will be entitled to a youth offender parole hearing in the future, Rios should be given the opportunity under *Franklin* and *Cook* to make a record of his youth-related mitigating factors.

## DISPOSITION

The order denying Rios's motion for a *Franklin* proceeding is reversed. The matter is remanded to the trial court with directions to schedule a hearing so that Rios may assemble information concerning his youth-related mitigating factors.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.

17 Cal.4th 148, 161, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party."].)