Filed 6/6/24  P. v. Payne CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B329503 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. YA015989 |
| v. | |
| CARLTON LAVERT PAYNE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Nicole C. Bershon, Judge. Affirmed.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A court sentenced Carlton Lavert Payne to two terms of life without the possibility of parole (LWOP) after a jury found him guilty of two counts of first degree murder and found true the special circumstance allegation of multiple murders under Penal Code[1] section 190.2, subdivision (a)(3). More than 27 years later, Payne filed a request to initiate a proceeding under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), seeking to make a record of information relevant to a future youth offender parole hearing. The trial court denied the request on the basis Payne's sentence renders him ineligible for relief. On appeal, Payne argues section 3051, subdivision (h) — the statute that makes him ineligible — violates the equal protection guarantees found in the federal and California Constitutions. He also contends that section 3051 causes his LWOP sentences to be cruel or unusual punishment under the California Constitution. We affirm.

## FACTS AND PROCEDURAL BACKGROUND[2]

On June 5, 1993, Payne attended a combined birthday and housewarming party at an apartment with Eara Pollard and their infant son. Payne was a member of the 190th Street East Coast Crips gang. While they were at the party, Pollard noticed Payne had a gun in his waistband and told him not to have the weapon while playing with children. He put it in a diaper bag. Five men arrived and invited Payne to smoke marijuana with

---

[1] All undesignated statutory references are to the Penal Code.

[2] We paraphrase the factual background set forth in the unpublished opinion in *People v. Payne* (May 13, 1997, B099459), which Payne includes in full in his opening brief.

2

them in a bedroom. Payne later came out and told Pollard that the men were Bloods but he was "not tripping." (An attendee testified that, to his knowledge, none were active members of the Crenshaw Mafia Gangster Blood gang.) Payne went back to the bedroom and remained there for some time. No one in the bedroom did anything to make Payne believe they were Bloods, though one of the men present, Darryl Benford, was wearing a red shirt. Benford tried to be friendly with Payne and told him his brother used to associate with the 118th Street East Coast Crips. The men did not threaten Payne and Payne also did not behave in a threatening manner.

However, Benford got into a verbal argument with Payne and asked another attendee whether he had a gun, though Benford then said "just forget it." Payne left the bedroom and grabbed the diaper bag and returned it without the gun. Pollard checked because she knew something was wrong based on how Payne was acting. The hostess's sister told the men it was time to sing happy birthday and everyone went to the kitchen. Pollard observed Payne put on some brown gloves and one of the men said something to him. Payne pulled the gun from his pants. Pollard attempted to stop him, but Payne grabbed one of the men, Marwinn Cook, and shot him in the head. He then shot another man, Richard Bolin. One of the attendees heard as many as six additional shots. Benford was shot in both arms. Marcus Mackey, a child, was shot in the left leg. Cook and Bolin died as a result of gunshot wounds to the head.

A jury convicted Payne of two counts of first degree murder (§ 187, subd. (a); counts 1 and 2), two counts of attempted willful, deliberate, and premeditated murder (§§ 664/187, subd. (a); counts 3 and 5), and one count of assault with a firearm (§ 245,

3

subd. (a)(2); count 4). In connection with counts 1, 2, 3 and 5, the jury found that Payne personally used a firearm within the meaning of section 12022.5, subdivision (a). In connection with counts 3 and 4, it found true the allegation that Payne personally inflicted great bodily injury within the meaning of section 12022.7. In November 1995, a court sentenced Payne to two LWOP terms for counts 1 and 2, plus 16 months for each count for the firearm enhancements; two life terms for counts 3 and 5, plus 16 months for each count for the firearm enhancements and three years for the great bodily injury enhancement for count 3; and four years for count 4 plus five years for the firearm enhancement and three years for great bodily injury enhancement. The court ordered that the sentence on count 4 be served first and the sentences on counts 1, 2, 3, and 5 each be served consecutively thereafter. Payne appealed and a panel of this division affirmed the judgment. (See *People v. Payne, supra,* B099459.)

In January 2023, Payne filed a motion to initiate a proceeding under *Franklin*, seeking to make a record of information relevant to a future youth offender parole hearing. In it, he asserted that he was 23 years old at the time of the crimes of conviction.[3] Payne acknowledged his LWOP sentences render

---

[3] It is unclear from the record whether Payne was 23 or 24 years old at the time of the crimes of conviction. The probation report indicates that his birth date was May 6, 1969, whereas the motion to initiate a proceeding under *Franklin* stated that he was 23, and his notice of appeal states that his birth date is October 27, 1969. Ultimately, we agree with the Attorney General that whether Payne was 23 or 24 years old at the time of the crimes of conviction is a distinction without difference, as both are over 18 and less than 26.

4

him statutorily ineligible for a youth offender parole hearing. Nevertheless, he argued that section 3051, subdivision (h) violates the equal protection guarantees found in the United States and California Constitutions. He also argued that the exclusion of 18- to 25-year-old LWOP offenders from youth offender parole violates the state constitutional ban on cruel or unusual punishment.

The trial court denied Payne's motion, noting the weight of authority holds section 3051, subdivision (h) does not violate equal protection. The court did not address his cruel and unusual punishment contentions in its written order. Payne timely appealed.

## DISCUSSION

1. **The denial of youth offender parole hearings under section 3051 to young adult offenders sentenced to LWOP does not violate equal protection.**

Our Legislature enacted section 3051 in light of United States Supreme Court decisions that recognized the lessened culpability and greater prospects for reform that distinguish juvenile from adult offenders. (See Stats. 2013, ch. 312, § 1; *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*); *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*).) Section 3051 requires the Board of Parole Hearings (the Board) to conduct a "youth offender parole hearing" at specified times during the incarceration of certain youthful offenders. (See § 3051, subds. (a)(1), (b); *Franklin*, *supra*, 63 Cal.4th at p. 277.) Generally, offenders who were younger than 26 years old when they committed the controlling offense are eligible for a youth offender parole hearing if they were sentenced to a determinate term or a life term with

5

the possibility of parole. (§ 3051, subd. (b).) Offenders sentenced to LWOP are entitled to a hearing only if they were younger than 18 years old when they committed the controlling offense. (*Id.*, subd. (b)(4).) The statute explicitly states it does not apply to "cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age." (*Id.*, subd. (h).) Section 4801 provides that, when a prisoner committed the controlling offense, as defined in section 3051, when he or she was 25 years of age or younger, the Board "shall give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity in the prisoner in accordance with the relevant case law." (§ 4801, subd. (c).)

In *Franklin*, the California Supreme Court interpreted section 3051 to require a youth offender have a "sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th at p. 284.) These hearings are commonly referred to as *Franklin* hearings. At a *Franklin* hearing, the offender and the People have the opportunity to "put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors" at the time of the offense. (*Ibid.*) "[A]n offender entitled to a hearing under section[ ] 3051 . . . may seek the remedy of a *Franklin* proceeding even though the offender's sentence is otherwise final." (*In re Cook* (2019) 7 Cal.5th 439, 450–451.)

Here, Payne was 23 or 24 years old when he committed the murders that resulted in the LWOP sentences. As Payne acknowledges, because he was not a juvenile when he committed

6

the controlling offenses, he is ineligible for a youth offender parole hearing under section 3051, subdivision (h). Nevertheless, Payne argues he is entitled to a *Franklin* hearing because section 3051, subdivision (h) violates the equal protection guarantees found in the United States and California Constitutions.

"At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification." (*People v. Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*).) Where the challenged law is not based on a suspect classification and does not burden fundamental rights, the law denies equal protection "only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose. [Citation.] This core feature of equal protection sets a high bar before a law is deemed to lack even the minimal rationality necessary for it to survive constitutional scrutiny. Coupled with a rebuttable presumption that legislation is constitutional, this high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair." (*Id*. at pp. 288–289; see *In re Murray* (2021) 68 Cal.App.5th 456, 463–464 (*Murray*) [applying rational basis review to claim section 3051 violates equal protection].)

Payne argues that he is similarly situated to persons with LWOP sentences who committed their controlling offenses before they were 18 years old and persons with non-LWOP sentences who committed their offenses before they were 26 years of age, both of which are entitled to a youth offender parole hearing under section 3051. However, our high court recently clarified: "[W]hen plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the

7

distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question. The only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review." (*People v. Hardin* (2024) 15 Cal.5th 834, 850–851 (*Hardin*).)

"A classification in a statute is presumed rational until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable. [Citation.] The underlying rationale for a statutory classification need not have been ' "ever actually articulated" ' by lawmakers, and it does not need to ' "be empirically substantiated." ' " (*Chatman, supra*, 4 Cal.5th at p. 289.) Payne argues that the Legislature lacked any rational basis to grant youth offender parole hearings to young adult offenders sentenced to non-LWOP terms and offenders under the age of 18 sentenced to LWOP terms while denying hearings to young adult offenders sentenced to LWOP terms. As Payne concedes, courts have repeatedly rejected this exact argument. Of the published opinions on the issue, all but one held section 3051 does not violate equal protection. (See, e.g., *People v. Ngo* (2023) 89 Cal.App.5th 116, 129; *People v. Bolanos* (2023) 87 Cal.App.5th 1069, 1080–1081; *People v. Morales* (2021) 67 Cal.App.5th 326, 347–349; *People v. Jackson* (2021) 61 Cal.App.5th 189, 199–200; *People v. Acosta* (2021) 60 Cal.App.5th 769, 780–781; *Murray, supra*, 68 Cal.App.5th at pp. 463–465; *In re Williams* (2020) 57 Cal.App.5th 427, 433–436 (*Williams*); but see *People v. Hardin* (2022) 84 Cal.App.5th 273, 278–279, review granted Jan. 11, 2023, S277487.)

Payne contends that these cases were wrongly decided. However, while this appeal was pending, the California Supreme Court decided *Hardin*, *supra*, 15 Cal.5th 834, which confirmed section 3051's exclusion of young adult offenders sentenced to LWOP does not violate equal protection.[4] We are bound by this authority. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455–456.) Accordingly, we reject Payne's argument.

2. **The denial of youth parole hearings to young adult LWOP offenders under section 3051 does not render Payne's LWOP sentences cruel or unusual punishment.**

Article I, section 17 of the California Constitution provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." A court assessing a claim of cruel or unusual punishment must "decide whether the penalty given 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity,' thereby violating the prohibition . . . against cruel or unusual punishment of article I, section 17 of the California Constitution." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1042; *In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted [prison sentence violates article I, section 17, if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity"], superseded by statute on other grounds as stated in *People v.*

---

[4] Although the court left open the possibility of "other challenges to the distinctions drawn by the special circumstances statute based on a more robust record or a more focused as-applied inquiry" (*Hardin*, *supra*, 15 Cal.5th at p. 862), Payne has not made an as-applied challenge to section 3051.

9

*West* (1999) 70 Cal.App.4th 248, 256.) In *Lynch*, our Supreme Court identified a three-pronged test for courts to use when reviewing disproportionality claims. (*Lynch*, at pp. 425–429.) "First, [it] examined the nature of the offense and the offender. [Citation.] Second, [it] compared the punishment with the penalty for more serious crimes in the same jurisdiction. [Citation.] Third, [it] compared the punishment to the penalty for the same offense in different jurisdictions. [Citation.]" (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136.)

"  ' "Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment. [Citations.]" [Citation.]' " (*People v. Abundio* (2013) 221 Cal.App.4th 1211, 1217.) A defendant must overcome a "considerable burden . . . in challenging a penalty as cruel or unusual." (*People v. Wingo* (1975) 14 Cal.3d 169, 174.) "The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. [Citations.] While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17, the validity of enactments will not be questioned 'unless their unconstitutionality clearly, positively and unmistakably appears.' [Citation.]" (*Ibid.*) "[T]he length of a sentence of imprisonment is largely a matter of legislative prerogative, and cannot violate the [prohibition against cruel and unusual punishment] in any but the rarest cases." (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1193.)

"While the federal proscription concerns 'cruel *and* unusual' punishments, article I, section 17 of the California Constitution states in pertinent part that '[c]ruel *or* unusual punishment may not be inflicted.' No distinction need be attached this difference from an analytic perspective, however." (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fn. 7.) Thus, even though "[w]e construe this provision separately from its counterpart in the federal Constitution" (*People v. Cartwright*, *supra*, 39 Cal.App.4th at pp. 1135–1136), "[t]here is considerable overlap in the state and federal approaches." (*People v. Baker* (2018) 20 Cal.App.5th 711, 733.) " '[B]oth standards prohibit punishment that is "grossly disproportionate" to the crime or the individual culpability of the defendant.' [Citation.] 'The touchstone in each is gross disproportionality.' [Citation.]" (*Ibid.*)

Payne concedes that his "LWOP sentences . . . may not meet the three-part test set forth in [*Lynch*]." We accept this concession.[5] However, Payne contends that sections 3051 and 4801 demonstrate that the Legislature has determined that offenders under the age of 26 years are less culpable than

_____

[5] Murder is among the most serious crimes conceivable, to say nothing of the fact that this was a double homicide case. (*Williams*, *supra*, 57 Cal.App.5th at p. 438 ["The United States and California Supreme Courts have recognized there is no crime more depraved or more injurious than intentional first degree murder. [Citation.] This is doubly true in the case of a double murder, even when committed by a 21 year old."]).) Following *Lynch*, our high court has indicated that all that is required is "intracase" review; i.e., an evaluation of whether the sentence is "grossly disproportionate" to the offense. (See, e.g., *People v. Bradford* (1997) 15 Cal.4th 1229, 1384.) In any event, Payne does not argue that LWOP is not a sentence imposed for murder in other jurisdictions.

individuals above 26 years who commit the same offenses. He argues that these sections "cause[] LWOP sentences, without any hope for a parole hearing and possible parole at some point, for such offenders, to be grossly disproportionate to the offenses for which they were imposed." We are not persuaded.

Following the enactment of section 3051, California courts have held that the imposition of LWOP sentences on young adult offenders does not violate the federal Constitution's ban on cruel and unusual punishment. In *Williams*, *supra*, 57 Cal.App.5th 427, the defendant, who was 21 years old when he shot and killed two people during the commission of a robbery, was sentenced to two consecutive terms of LWOP. (*Id.* at p. 430.) The defendant filed a petition for writ of habeas corpus in which he argued that the denial of a youth offender parole hearing under section 3051 violated his right to equal protection of the laws and constituted cruel and unusual punishment. (*Ibid.*) With respect to cruel and unusual punishment, the defendant argued that the LWOP sentence for the crime he committed was grossly disproportionate to his diminished culpability as a 21-year-old offender. (*Id.* at p. 437.) He asserted that his age rendered him less culpable than a mature adult who commits the same crimes, yet both he and a mature adult will serve the same LWOP sentence if he is not granted a youth offender parole hearing — indeed, he may be imprisoned for *longer* due to the fact that he was younger when incarcerated. (*Id.* at pp. 437–438.) The Court of Appeal recognized that, "[w]ith the exception of death, LWOP is the most severe penalty available under our Penal Code" and that "[s]ome LWOP inmates may be more culpable than other LWOP inmates." (*Id.* at p. 438.) It explained that "[c]ourts need not rank every convicted defendant on a continuum of culpability and

12

ensure each of their sentences are precisely matched to their particular culpability as compared to another defendant's culpability." (*Ibid.*) The court also noted that our Supreme Court has observed that a sentence will rarely be constitutionally disproportionate where the crime committed is " 'subject by statute to life-maximum imprisonment.' " (*Ibid.*, citing *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.)

"In light of the severity of this crime and the magnitude of the harm inflicted," the *Williams* court concluded that the LWOP sentence was not " 'grossly disproportionate' " to the defendant's culpability. (*Williams*, *supra*, 57 Cal.App.5th at p. 439.) It observed that, "[t]o the extent petitioner contends an LWOP sentence is an unconstitutional cruel and unusual punishment when imposed on *any* 21-year-old defendant, . . . our Supreme Court has essentially rejected that very argument in the context of the death penalty." (*Ibid.*, citing *People v. Flores* (2020) 9 Cal.5th 371, 429.) "If the Eighth Amendment does not prohibit a sentence of death for 21 year olds, then most assuredly, it does not prohibit the lesser LWOP sentence." (*Williams*, at p. 439; accord, *People v. Acosta*, *supra*, 60 Cal.App.5th at pp. 781–782 [declining to extend *Miller* to 21-year-old offender on the autism spectrum and holding that triple LWOP sentence for the murder of three people was not barred by the Eighth Amendment].)

Like the defendant in *Williams*, Payne was over the age of 18 but under the age of 26 when he shot and killed two people. Payne does not seek to distinguish the facts of *Williams* but asserts that its reasoning does not apply because it was decided under the Eighth Amendment of the federal Constitution, not article I, section 17 of the California Constitution. Payne contends that the choice of the disjunctive "or" in the California

13

Constitution was purposeful (*People v. Anderson* (1972) 6 Cal.3d 628, 634–367, superseded on other grounds by Cal. Const., art. I, § 27), a point we do not dispute. However, he fails to explain why the difference between the federal constitution's use of "and" and the California constitution's use of "or" has significance in this case and renders the analysis in cases like *Williams* inapplicable.

As discussed, a punishment violates both the California and federal Constitutions if it is grossly disproportionate. (See *People v. Baker*, *supra*, 20 Cal.App.5th at p. 733.) *Williams* concluded that the LWOP sentence was not grossly disproportionate to the offense committed and is therefore instructive. Further, as the court in *Williams* observed, the California Supreme Court has reaffirmed the age of 18 as the bright line that our society uses to separate childhood from adulthood for many purposes, including the propriety of criminal punishments like the death penalty. In *People v. Tran* (2022) 13 Cal.5th 1169, 1234, our high court rejected the argument "that imposing the death penalty on persons for crimes committed while they were 18 to 20 years old violates the state and federal Constitutions because it is cruel and unusual punishment and because a death sentence cannot be reliably imposed on such youthful offenders." The court explained that section 3051 did " 'not establish the "national consensus" necessary to justify a categorical bar on the death penalty for individuals between the ages of 18 and 21 at the time of their offenses.' " (*Tran*, at p. 1235, quoting *People v. Flores*, *supra*, 9 Cal.5th at p. 429.) This reasoning applies with greater force to a defendant who was older at the time of the crimes of conviction *and* subject to the lesser sentence of LWOP. (See *Williams*, *supra*, 57 Cal.App.5th at p. 439.)

Payne concedes that the decision in *People v. Argeta* (2012) 210 Cal.App.4th 1478 undermines his position on appeal. In *Argeta*, the defendants were 15 and 18 years old when they committed the offenses and were convicted of one count of murder and five counts of attempted murder. (*Id.* at p. 1482.) The trial court imposed a minimum aggregate sentence of 100 years on the minor defendant. (*Ibid.*) It is unclear from the published portion of the opinion what sentence the trial court imposed on the adult defendant. Division Four of this court analyzed the defendants' federal and state constitutional claims of cruel and/or unusual punishment together. (*Id.* at pp. 1480–1482.) The court observed that the sentence for the defendant who was 15 years old at the time of the crime was the functional equivalent of LWOP. (*Id.* at p. 1482.) Although it declined to hold that the sentence was categorically barred as cruel and unusual, it concluded that the trial court's sentencing determinations "must be reversed and remanded for resentencing on all counts in a manner consistent with the decision of the United States Supreme Court in *Miller* and our Supreme Court in [*People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*)[6]]." (*Id.* at p. 1482.)

---

[6] *Caballero*, *supra*, 55 Cal.4th 262 involved a juvenile who was sentenced to 110 years to life for multiple nonhomicide offenses. (*Id.* at pp. 268–269.) The court found that when a juvenile is sentenced to minimum terms that exceed his or her life expectancy, the punishment is the functional equivalent of LWOP and constitutes cruel and unusual punishment. (*Ibid.*) It also concluded "the state may not deprive [juveniles] at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Id.* at p. 268.) *Caballero* also laid out mitigating circumstances that must be considered by a sentencing court before determining at what point juveniles can seek parole, including their

With respect to the defendant who was an adult at the time of the crimes, the court rejected the contention that his sentence was categorically cruel and/or unusual, even though he was only five months over the age of 18. (*People v. Argeta, supra,* 210 Cal.App.4th at p. 1482.) The court noted that, while " '[d]rawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules . . . [, it] is the point where society draws the line for many purposes between childhood and adulthood.' [Citation.]" (*Ibid.*) "Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point." (*Ibid.*) The court thus opted to respect the line drawn by society and the decisions of the United States Supreme Court and our own high court for sentencing purposes. (*Ibid.*; see also *People v. Abundio, supra,* 221 Cal.App.4th at pp. 1219–1221 [rejecting defendant's attempts to rely on *Graham* and *Miller* to support argument that LWOP sentence for special circumstance murder committed when he was 18 was cruel or unusual punishment].)

Payne argues that *Argeta* is not instructive because it was decided before the enactment of section 3051. However, *Argeta* was decided after and cites *Miller, Graham,* and *Caballero,* the same decisions the Legislature identified as the impetus for section 3051. (See Stats. 2013, ch. 312, § 1.) Moreover, considering the Supreme Court's ruling in *Tran,* we are not persuaded that the enactment of section 3051 undermines the

---

age, whether they were a direct perpetrator or an aider and abettor, and their physical and mental development. (*Ibid.*)

16

reasoning in *Argeta* as applied to LWOP sentences imposed on young adults.

Accordingly, we conclude that section 3051 does not render the imposition of LWOP sentences on individuals over 18 and under 26 years old cruel or unusual punishment in violation of the California Constitution.

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

ADAMS, J.