Filed 6/12/24  In re H.T. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re H.T., a Person Coming Under the Juvenile Court Law. | C098794 |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>    v.<br><br>H.T.,<br><br>     Defendant and Appellant. | (Super. Ct. No. JV140490) |

     Minor H.T. admitted to forcibly committing a lewd and lascivious act on a child under 14 and admitted the enhancement allegation that he personally inflicted great bodily injury.  He was adjudged a ward of the juvenile court and committed to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ).  After the Legislature began the process of closing DJJ, the probation department filed a petition

to set aside H.T.'s DJJ commitment and for a recall disposition hearing. Upon conducting the hearing, the juvenile court committed H.T. to the Valley Oak Youth Academy, Sacramento County's secure youth treatment facility, with a baseline commitment of two years and a maximum period of confinement of two years. On appeal, H.T. asserts (1) the juvenile court abused its discretion because less restrictive dispositional alternatives were available, and (2) predisposition custody credits should have been applied against the baseline term, not the maximum term of confinement. We affirm.

BACKGROUND

On November 26, 2019, Sacramento County Sheriff's Office deputies responding to a report of sexual abuse of a child spoke with a social worker who indicated the 11-year-old victim, H.T.'s sister, was pregnant with H.T.'s child. The victim was 10 years old at the time of conception. The victim told deputies that H.T., who was 17 years old at the time, would wait until their parents were out of the house and he would hold her down and force her to have vaginal intercourse with him against her will. This occurred at least seven times. H.T. acknowledged having intercourse with the victim five to 10 times over the course of seven months. He claimed the intercourse was consensual. However, he also acknowledged knowing it was wrong.

On June 10, 2021, the Sacramento County District Attorney filed an amended juvenile wardship petition charging H.T. with one count of lewd and lascivious act on a child under 14 (Pen. Code, § 288, subd. (a); count one), one count of lewd and lascivious act on a child under 14 by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (Pen. Code, § 288, subd. (b)(1); count two), and seven counts of rape by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (Pen. Code, § 261, subd. (a)(2); counts three-nine). The petition further alleged H.T. personally inflicted great bodily injury in the commission of count two. (Pen. Code, § 12022.7, subd. (a).)

2

On June 17, 2021, H.T. admitted to count two and admitted the truth of the personal infliction of great bodily injury enhancement allegation. The juvenile court dismissed the remaining counts, adjudged H.T. a ward of the court, and ordered him committed to DJJ with juvenile jurisdiction to extend until the age of 25.

Beginning with Senate Bill No. 823 (2019-2020 Reg. Sess.), the Legislature began the process of closing DJJ. (Stats. 2020, ch. 337.) On December 12, 2022, the probation department filed a petition pursuant to Welfare and Institutions Code[1] section 731.1 to set aside H.T.'s DJJ commitment and for a recall disposition hearing.

A probation department memorandum filed on February 21, 2023, stated H.T. had been participating in a sexual behavior treatment program, and that he was on stage two of the seven-stage program. He also participated in a skill-of-the-week program and had graduated from a high school program. He was employed in a youth correctional kitchen as a crew member and expressed interest in a career in culinary arts. His overall risk was most recently assessed as low, his overall need was moderate, and his overall strength was moderate. The overall risk and overall need assessments were both improvements from an evaluation performed approximately 11 months earlier. H.T. had not received any level two or level three disciplinary behavior reports since his commitment to DJJ. Recommendations included that H.T. continue sex offender treatment, "as he did not complete his mandated Sexual Behavior Treatment Program prior to discharge from DJJ," and that he be continued as a ward committed to the Sacramento County secure youth treatment facility.

On March 23, 2023, the juvenile court granted the petition, recalled H.T.'s commitment, and scheduled a recall disposition hearing. The probation department filed an updated memorandum with the court on May 11, 2023. The updated memorandum

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

3

contained information consistent with the prior memorandum concerning H.T.'s programming and assessments. It also contained discussions addressed to each of the five statutory criteria to be considered by the court, discussed below. (§ 875, subd. (a)(3)(A)-(E).)

In H.T.'s memorandum of points and authorities, he disagreed with the probation department's recommendation, asserting a less restrictive option could provide for his treatment needs while maintaining public safety. H.T. asserted there was no rehabilitative need to continue his confinement in a facility away from his family rather than having him participate in treatment and family counseling in the community. In addition to the circumstances of his programming, behavior, and compliance, H.T. relied on scientific data showing that commitment would be contrary to the juvenile court's rehabilitative goals and compound the harms caused by confinement, and which supported the position that noncustodial disposition is preferable wherever available and appropriate.

The district attorney agreed with the probation department's recommendation. The district attorney emphasized July 20, 2022 log entries indicating that, while H.T. acknowledged what he did, he did not believe his offenses were violent. Rather, he only admitted getting his sister pregnant and he maintained the sexual acts were consensual. H.T. "demonstrated very little insight." The district attorney concluded there was no suitable less restrictive alternative that would meet H.T.'s needs and satisfy the need for public safety.

At the May 23, 2023 recall disposition hearing, the juvenile court noted it had reviewed each of these filings. The court noted H.T. had made progress, but stated he still "need[ed] time." The court's tentative ruling was that H.T. would be committed to the secure youth treatment facility.

In her argument, H.T.'s attorney emphasized the court was required to decide whether there was no suitable, less restrictive alternative based on the five statutory criteria. Counsel stated that, other than stating H.T. needed more time, the court had

4

failed to identify any factors indicating there was no suitable alternative in the community. She also emphasized that nothing in the statutes stated an individual must be fully rehabilitated before being released into the community. Counsel emphasized it was not H.T.'s position that he should not do the programming; the question was where to do the programming. Counsel reiterated, "he's done remarkabl[y] in custody, and so I don't think the Court is truly looking at the factors to make the determination that the only option for [H.T.] to engage in services right now is for him to be in a locked jail."

The court recited the five statutory criteria to be considered (§ 875, subd. (a)(3)(A)-(E)), and encouraged H.T.'s appointed counsel to address the factors that supported her argument. She responded that she had sufficiently addressed the factors in her brief, asserted the court was "declining to engage in a thorough analysis of these factors in order to come to its conclusion that [H.T.] needs to be in a locked facility," and shifted focus to custody credits.

The court stated it had "considered the severity of the offense, the success of previous attempts to rehabilitate[,] the programming, treatment, education offered in [the Sacramento County secure youth treatment facility], the community safety of some less restrictive disposition and the appropriateness of confinement in" the Sacramento County secure youth treatment facility. (See § 875 subd. (a)(3)(A)-(E).) The court stated it had reviewed the report of the probation department, and it adopted the recommendations and findings in that report. The minute order recited that, upon consideration of the statutory criteria (see § 875, subd. (a)(3)(A)-(E)), the court determined a less restrictive alternative was not suitable for H.T.'s rehabilitation, treatment, and education. H.T. was to continue as a ward of the juvenile court pursuant to section 725, subdivision (b). The court committed H.T. to the Valley Oak Youth Academy with a baseline commitment of two years and a maximum term of confinement of two years, noting the maximum exposure was 11 years. H.T. timely appealed, filing his notice of appeal in May 2023. His opening

5

brief was filed in October 2023, and the matter became fully briefed on February 26, 2024.

DISCUSSION

I

*Commitment to the Secure Youth Treatment Facility*

H.T. asserts the juvenile court abused its discretion because less restrictive dispositional alternatives were suitable. According to H.T., while there are five statutory criteria for the juvenile court to consider in deciding on its disposition, the record demonstrates the court here was focused on the severity of his offense and the fact that he had not yet completed all seven steps of his DJJ sexual behavior treatment program. We conclude the juvenile court did not abuse its discretion, as its determination was supported by substantial evidence.

" ' "We review a juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision." [Citation.] " '[D]iscretion is abused whenever the court exceeds the bounds of all reason, all of the circumstances being considered.' " [Citation.] We will not disturb the juvenile court's findings when there is substantial evidence to support them. [Citation.] " 'In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.' " ' [Citation.] 'A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence.' " (*In re Khalid B.* (2015) 233 Cal.App.4th 1285, 1288.) "The purpose of the juvenile court is to protect both the minor under its jurisdiction and the public, and to preserve and strengthen the minor's family ties whenever possible." (*In re Walter P.* (2009) 170 Cal.App.4th 95, 99; see § 202, subd. (a).) "Central to the juvenile court's mission are the care, treatment, guidance, and rehabilitation of the delinquent juvenile." (*In re Walter P.*, at p. 99; see § 202, subd. (b).)

6

A juvenile court may order that a minor be committed to a secure youth treatment facility for a period of confinement if, among other things, the "court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." (§ 875, subd. (a)(3).) In making such a commitment determination, the juvenile court must consider: "(A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims. [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward. [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility." (§ 875, subd. (a)(3)(A)-(E).)

The juvenile court considered the first factor, the severity of the offense. (§ 875, subd. (a)(3)(A).) In fact, H.T.'s contention is that the court considered that factor to the exclusion of others, or at least accorded too much weight to it. In any event, H.T.'s offense was indeed severe. He forcibly committed a lewd and lascivious act on a child under 14, and, in the commission of the offense, he personally inflicted great bodily injury on the victim. The victim was his sister and, when she was 10 years old, he forced her to have intercourse and got her pregnant. According to his own admission, he had intercourse with her five to 10 times.

H.T. did not have a previous delinquent history. However, the juvenile court did consider the "adequacy and success of previous attempts by the juvenile court to rehabilitate" H.T. (§ 875, subd. (a)(3)(B)), in the sense of addressing his time at DJJ since

his 2021 commitment. The court noted H.T. had "made progress in his rehabilitation, his performance at [DJJ] was, I think, very positive. He has begun to make progress towards rehabilitation, but he's moving in the direction." The probation department's initial memorandum stated H.T. participated in a skill-of-the-week program and had graduated high school. He was employed as a kitchen crew member and expressed interest in a career in culinary arts. H.T.'s overall risk was low, his overall need was moderate, and his overall strength was moderate, and the former two classifications were improvements from an earlier evaluation. H.T. had not received any level two or level three disciplinary reports. Conversely, it was the court's assessment, at least tentatively, that H.T. "still does need time." The probation department's initial memorandum stated H.T. was on stage two of the seven-stage sexual behavior treatment program. Additionally, according to the log entry dated July 20, 2022, more than a year after his commitment, while H.T. had acknowledged what he did, he did not believe his offense was violent. He only admitted getting his sister pregnant, and he maintained the sexual acts were consensual. He had "not yet made the connections of his controlling and manipulative behaviors towards his victim both before and during the attacks." He did not admit the violence and aggressiveness of his offense. The log stated H.T. "demonstrated very little insight."

The court considered whether "the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of" H.T. (§ 875, subd. (a)(3)(C)), and stated it had "information that would suggest that it is." Both of the probation department's memoranda contained pages-long discussions of the Sacramento County secure youth treatment facility. These discussions included an overview and a discussion of the ward's probable benefit, including subsections addressing behavior treatment program interventions, mental health treatment programs, the sexual behavior treatment program, academics, vocational matters, and reentry.

The court stated it had considered whether "the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition." (§ 875, subd. (a)(3)(D).) The probation department's updated memorandum stated H.T. had not completed the sexual behavior treatment program that was "geared towards targeting his high area needs." The memorandum again emphasized H.T.'s opinions that the offense was consensual and that the victim may be responsible for her participation. The memorandum continued: H.T. "would benefit from continued Sexual Behavior Treatment to address these ideations and include further education in consent and victim empathy. Furthermore, [H.T.] would benefit from individual counseling services to address his childhood trauma. Therefore, as [H.T.] continues to have therapeutic needs that have yet to be addressed and/or met, an alternative or less restrictive disposition for the youth is not appropriate at this time."

Finally, with regard to the criterion addressed, among other things, to H.T.'s "age, developmental maturity, [and] mental and emotional health . . . affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility" (§ 875, subd. (a)(3)(E)), the updated memorandum recited facts concerning H.T.'s upbringing and stated, although H.T. "and his mother denied any history of trauma, [H.T.'s] therapeutic team at DJJ encouraged him to continue services working on his childhood trauma and how it may impact his decision making skills and emotional wellbeing."

The court stated that it had "reviewed the report and adopt[ed] the recommendations and finding[s]" in the report. The recommendation in the updated report stated in part: "The youth has not completed a Sexual Behavior Treatment Program while in custody. Although the youth has admitted he should not have committed the offense, he has displayed a lack of understanding of the concept of 'consent' and how coercion and manipulation are linked to his level of aggression. Although the youth has shown significant progress in working on these concepts, he

9

continues to have high risk areas of need that have not yet been met and/or addressed. [¶] Should the youth be order[ed] to [the secure youth treatment facility], probation will convene a multidisciplinary team made up of professionals from Probation, Social Services, Behavioral Health, and the Sacramento County Office of Education . . . to assist in the development of the youth's Individual Rehabilitation Plan . . . and to assist in the youth's re-entry process or step-down planning." The report recommended H.T. be continued a ward of the juvenile court and committed to Sacramento County's secure youth treatment facility. Among the findings, which the court adopted, the report stated the court had "considered all the criteria as to the appropriate disposition for the subject and has determined a less restrictive alternative is unsuitable for the rehabilitation, treatment, and education of the subject."

Based on the foregoing, the record establishes the juvenile court considered the requisite statutory criteria (§ 875, subd. (a)(3)(A)-(E)) and concluded less restrictive options were not suitable. Substantial evidence, discussed at length above, supports the court's determination.

The fact that the juvenile court addressed specific concerns about the severity of H.T.'s offense and that H.T. was only on the second stage of his seven-stage sexual behavior treatment program at DJJ does not establish the court failed to weigh, or accord sufficient weight to, other criteria, and the record establishes that it did not. The fact that H.T. has progressed and performed well in some aspects of his programming, while commendable, does not establish substantial evidence does not otherwise support the juvenile court's determination.

H.T. relies on *In re Michael R.* (1977) 73 Cal.App.3d 327, 340, in asserting the "juvenile court law requires that a minor be given the opportunity to succeed in other, less imposing programs before being ordered to the most restrictive program." This was not the holding of *Michael R.* That court stated: "[C]amp placement, a less restrictive alternative, was an appropriate disposition since it fulfilled all the purposes of the

10

Juvenile Court Law.  Accordingly, the [California Youth Authority][2] commitment of this first offender *solely on the basis of the seriousness of the offense* was an abuse of discretion.  We do not hold that a juvenile court can never send a first offender to the [California Youth Authority].  All we hold is that the juvenile court must consider each individual case on its merits without a mechanized approach based solely on the seriousness of the offense and must evaluate the appropriateness of the available lesser alternative dispositions in light of the purposes of the Juvenile Court Law."  (*Ibid*., fn. omitted, italics added.)

Here, the juvenile court made its individualized determination that less restrictive alternatives were not suitable in light of the purposes of the juvenile court law.  Based on the record, the court did not abuse its discretion.

II

*Application of Custody Credits*

As his attorney argued before the juvenile court, H.T. asserts his predisposition custody credits should have been applied against the baseline term rather than the maximum term of confinement.  He asserts that a consistent reading of section 875, case law, and the rule of lenity all support the conclusion that his custody credits should be applied against his baseline term.  H.T. also asserts that equal protection principles demand minors ordered to secure youth treatment facilities must be afforded the same protections as minors formerly ordered to DJJ.  We conclude the plain language of section 875 requires juvenile courts to apply precommitment custody credits to the maximum term of confinement, not the baseline term, and further that the statute does not violate equal protection principles.

---

**2**  The California Youth Authority was the predecessor to DJJ.  (*In re Ernesto L.* (2022) 81 Cal.App.5th 31, 40 (*Ernesto L.*).)

11

A.     *Statutory Interpretation of Section 875*

We review matters involving statutory interpretation de novo.  (*In re Antoine D.* (2006) 137 Cal.App.4th 1314, 1320.)  " ' "Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose.  [Citation.]  We must look to the statute's words and give them their usual and ordinary meaning.  [Citation.]  The statute's plain meaning controls the court's interpretation unless its words are ambiguous."  [Citations.]  If the words in the statute do not, by themselves, provide a reliable indicator of legislative intent, "[s]tatutory ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes." ' "  (*People v. Lucero* (2019) 41 Cal.App.5th 370, 394-395.)  " 'If the statute is ambiguous, we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy.' "  (*Id*. at p. 395.)

"In making its order of commitment for a ward, the court shall set a baseline term of confinement for the ward that is based on the most serious recent offense for which the ward has been adjudicated.  The baseline term of confinement shall represent the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge to a period of probation supervision in the community."  (§ 875, subd. (b)(1).)

In addition to setting the baseline term, "the court shall additionally set a maximum term of confinement for the ward based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation.  The maximum term of confinement shall represent the longest term of confinement in a facility that the ward may serve . . . ."  (§ 875, subd. (c)(1).)

The plain language of section 875 requires juvenile courts to apply precommitment custody credits to the maximum term of confinement, not the baseline

12

term: "Precommitment credits for time served must be applied against the maximum term of confinement as set pursuant to this subdivision." (§ 875, subd. (c)(1)(C); see *In re M.B.* (2024) 99 Cal.App.5th 435, 470 ["we think it is clear the application of precommitment credits against the baseline term is not intended"].) Where statutory language is clear, we must follow its plain meaning " ' " 'unless a literal interpretation would result in absurd consequences the Legislature did not intend.' " ' " (*In re N.R.* (2023) 15 Cal.5th 520, 538.) H.T. has not established that following the plain meaning of section 875 leads to absurd results not intended by the Legislature.

H.T. relies on *Ernesto L., supra,* 81 Cal.App.5th 31. That court held that "when a minor is committed to DJJ, a juvenile court must apply the minor's precommitment credits against the maximum custodial term." (*Id*. at p. 34, fn. omitted.) H.T. asserts that the secure youth treatment facilities did not merely de facto replace DJJ, but did so expressly. Thus, provisions pertaining to former DJJ commitments were to be applied toward commitment to a secure youth treatment facility. And, according to H.T., the "reasoning of *Ernesto L.*," while decided under a different statutory scheme, "is directly applicable to the question in" this case. We disagree.

*Ernesto L.* concerned a commitment to the DJJ under section 731, whereas here, H.T. was committed to a secure youth treatment facility under section 875. Section 731 governs the actual maximum custodial term that a youth committed to DJJ can serve, by specifically limiting the maximum term to the "middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (§ 731, subd. (b).) Unlike section 731, which is silent as to the application of precommitment custody credits, the plain language of section 875 makes explicitly clear that the juvenile court must apply precommitment custody credits against the maximum term of confinement, not the baseline term. (§ 875, subd. (c)(1)(C).)

Moreover, the juvenile court is required to "schedule and hold a progress review hearing for the ward not less frequently than once every six months. In the review

hearing, the court shall evaluate the ward's progress in relation to the rehabilitation plan and shall determine whether the baseline term of confinement is to be modified. . . . At the conclusion of each review hearing, upon making a finding on the record, the court may order that the ward remain in custody for the remainder of the baseline term or may order that the ward's baseline term or previously modified baseline term be modified downward by a reduction of confinement time not to exceed six months for each review hearing. The court may additionally order that the ward be assigned to a less restrictive program, as provided in subdivision (f)." (§ 875, subd. (e)(1)(A).) Thus, the baseline term is subject to modification at hearings held at least every six months. As such, the baseline term is not equivalent to the maximum custodial term set under section 731 and addressed in *Ernesto L.*, and we decline to apply *Ernesto L.* to baseline terms governed by section 875.

B.     *Equal Protection*

Both the California and federal Constitutions "extend to persons the equal protection of law." (*People v. Chatman* (2018) 4 Cal.5th 277, 287; see U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) "[W]hen a statute involves neither a suspect classification nor a fundamental right, the 'general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.' " (*People v. Hardin* (2024) 15 Cal.5th 834, 847.) We reject H.T.'s equal protection claim because the two groups identified by H.T. are not treated differently.

For the reasons stated in *In re M.B.*, *supra*, 99 Cal.App.5th 435, the two statutory schemes do not treat differently the groups identified by H.T.: juveniles subject to DJJ commitment under section 731 and juveniles subject to commitment at county secure youth treatment facilities under section 875. Both limit the maximum exposure in the same manner. (*In re M.B.*, at pp. 466-467; §§ 726, subd. (d)(1), 875, subds. (c)(1)(B), (i).) Both afford the juvenile courts discretion to set a maximum term of confinement

that is lower than the middle term of the sentencing triad that is the statutory maximum. (*In re M.B.*, at p. 467; §§ 731, subd. (b), 875, subd. (c)(1).) And, under each scheme, "precommitment credits are to be applied against the potentially lower maximum term set by the court." (*In re M.B.*, at p. 467; § 875, subd. (c)(1)(C); see also *Ernesto L.*, *supra*, 81 Cal.App.5th at pp. 41-42.)

Lastly, the People claim the juvenile court failed to calculate H.T.'s custody credits and therefore remand is warranted. However, the probation department's updated memorandum specified H.T. was entitled to 1,270 days of custody credits, the court adopted the memorandum's findings and recommendations, and the minute order confirms the court awarded H.T. 1,270 days of custody credits. Remand is unnecessary.

DISPOSITION

The May 23, 2023 disposition order is affirmed.

_____/s/_____
BOULWARE EURIE, J.

We concur:


_____/s/_____
DUARTE, Acting P. J.


_____/s/_____
RENNER, J.